1   XAVIER BECERRA
    Attorney General of California
2   MICHAEL L. NEWMAN
    Senior Assistant Attorney General
3   KATHLEEN BOERGERS
    Supervising Deputy Attorney General
4   KARLI EISENBERG
    BRENDA AYON VERDUZCO
5   ANNA RICH, SBN 230195
    Deputy Attorneys General
6     455 Golden Gate Ave., Suite 11000
      San Francisco, CA 94102
7     Telephone: (415) 510-3907
      Fax: (415) 703-1699
8     E-mail: Anna.Rich@doj.ca.gov
    *Attorneys for Plaintiff State of California, by and*
9   *through Attorney General Xavier Becerra*

10              IN THE UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12

| | |
|---|---|
| 13  **STATE OF CALIFORNIA, by and through ATTORNEY GENERAL** | Case No: |
| 14  **XAVIER BECERRA,** | |
| 15                                    Plaintiff, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| 16       v. | Administrative Procedure Act Case |
| 17  **ALEX AZAR, in his OFFICIAL** | Date: |
| 18  **CAPACITY as SECRETARY of the U.S. DEPARTMENT of HEALTH &** | Time: |
| 19  **HUMAN SERVICES; U.S. DEPARTMENT of HEALTH & HUMAN SERVICES,** | Dept: Judge: |
| 20                                   Defendants. | Trial Date: Action Filed: |
| 21 | |

22

23

24

25

26

27

28

1

# INTRODUCTION

1.      The State of California brings this action to challenge Defendants the U.S. Department of Health and Human Services and its Secretary Alex Azar's unlawful and unjustified attempt to undermine Title X of the Public Health Service Act, our nation's sole federally funded program devoted to family planning.  For decades, Title X has provided critical, evidence-based healthcare services to women, men, and families in California, contributing to the State's overall health and well-being and furthering the State's objectives of promoting public health and broad-based access to contraceptive and other preventive care.  Defendants' new Rule, "Compliance with Statutory Program Integrity Requirements" (hereinafter "the Rule"), imposes new, onerous and unnecessary requirements for healthcare providers, including "gag" rules that prevent Title X healthcare providers from giving comprehensive, accurate and nondirective healthcare information to their female patients and mandating physical and financial separation between family planning programs and facilities that provide either abortion services or referrals to such services.  The Rule undermines clinically established standards of care, interferes with the patient-provider relationship, and contradicts a core purpose of the Title X program.  This Rule will deprive Californians of access to needed reproductive care and cause harm to public health in California and the public fisc.

2.      The U.S. Department of Health and Human Services (HHS) published its final rule, HHS-OS-2018-0008, on March 4, 2019.  *See* 84 Fed. Reg. 7714 (Mar. 4, 2019) (amending 42 C.F.R. Chapter I, Subchapter D, Part 59).  The Rule purports to "ensure compliance with, and enhance implementation of, the statutory requirement that none of the funds appropriated for Title X may be used in programs where abortion is a method of family planning."  84 Fed. Reg. at 7714.  Yet nowhere in Defendants explanation of the Rule is there any evidence that current Title X programs are, in fact, failing to implement federal law.  Instead, the Rule itself deviates from the Title X statute in ways that threaten to disrupt the financial and physical integrity of Title X providers (including doctors, nurses, and clinics), disregarding well-established clinical guidelines, and upending well-founded prior agency decisions.

3. California's Title X provider network is the largest in the nation and plays a central role in ensuring access to comprehensive family planning, education, and related preventive health services to one million patients annually. The benefits of the existing Title X program are many: helping women avoid an estimated 822,000 unplanned pregnancies in 2015 alone, which would have resulted in 387,000 unplanned births and 278,000 abortions; substantially reducing teen unintended pregnancy rates; and reducing the transmission of sexually transmitted diseases like gonorrhea and chlamydia. Only a determined intent to interfere with women's constitutionally protected rights to make their own choices about their reproductive healthcare and futures can explain HHS's decision to issue a Rule that will have such a devastating effect on public health and the Title X network.

4. In a comment letter filed with HHS in opposition to the Rule on July 30, 2018, the Attorneys General of California and thirteen other states urged HHS to withdraw the Rule on the grounds that it harms state residents by interfering with the provider-patient relationship, presenting women seeking or considering an abortion with illusory healthcare options, and creating barriers for people seeking care, among many other negative impacts. The letter also explained that the Rule, if finalized, would decrease access to care, with an especially negative impact on low-income families, women (particularly women of color), and rural communities, as well as harm public health and the public fisc.

5. Notwithstanding these and other comments from a host of affected state and local governments, medical providers, public health officials, and patients, HHS failed to adequately address these important concerns in the Rule. While paying lip-service to public comment, HHS did not acknowledge or address the weight of mainstream medical providers' views, such as the American College of Obstetricians and Gynecologists' comment opposing the Rule (which it described as "prioritizing ideology over scientific evidence"), or public health experts' evidence showing that the Rule would have perverse consequences, including likely reducing access to contraceptive care and increasing unintended pregnancies and abortions.

6. The Rule now places California and its Title X providers in an untenable situation. If existing healthcare providers are forced to decide whether to provide full and accurate

information to patients or forgo federal Title X funding, numerous providers will have no choice but to sacrifice needed funds, to the detriment of the patients they serve. Many providers will be forced to leave the program because its new strictures conflict with applicable California state law. California stands to lose more than twenty million dollars annually. The funds of providers that do remain in the program will be held hostage to requirements that are contrary to medically approved, clinical standards of care. Moreover, the Rule establishes new eligibility requirements for Title X providers that will lower overall standards for quality of care, allowing new, less qualified providers to offer Title X services despite their failure to meet well-established clinical standards, such as offering nondirective, nonjudgmental counseling for pregnant women about their options, including complete and accurate referrals for patients who become pregnant and wish to seek an abortion.

7. As a result, the availability and quality of family planning services in California will be harmed. The low-income women, men, and teenagers who are the primary intended beneficiaries of Title X will suffer. Reduced access to diagnostic and preventive healthcare provided by the existing Title X network will ultimately weaken the public health of communities in California and nationwide.

8. The Rule fits within the broader context of Defendants' deliberate effort to limit women's access to the full range of reproductive healthcare, including abortion care, and interfere with a woman's constitutionally protected right to make her own reproductive choices. For example, one of the current federal government's first acts was to undo federal regulations protecting Title X providers from state efforts to exclude them for reasons unrelated to their ability to provide Title X services, efforts that HHS had previously found interfered with the purpose of Title X. *See* Joint Res., Pub. L. No. 115-23, 131 Stat. 89 (2017) (providing for congressional disapproval of HHS's Title X requirements set forth in 81 Fed. Reg. 91852 (Dec. 19, 2016)). Defendants then unlawfully issued two interim final rules effective immediately, and then issued final regulations, in an attempt to weaken the Affordable Care Act's requirement of

1    cost-free contraceptive coverage.[1]  And the federal administration's proposed fiscal year 2018

2    budget sought specifically to exclude Title X provider Planned Parenthood Federation of America

3    and its affiliates from Title X, Medicaid, and other federal programs.

4        9.      In this latest extraordinary overreach, HHS has exceeded the scope of its statutory

5    authority and acted in a manner that is arbitrary, capricious, and not in accordance with law, in

6    violation of the Administrative Procedure Act (APA) and the U.S. Constitution.  The Rule will

7    harm the State of California and its residents who depend upon Title X services.  The Secretary

8    therefore should be preliminarily and permanently enjoined from enforcing the Rule.

9

# JURISDICTION AND VENUE

10        10.     The Court has jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the

11    laws of the United States), 28 U.S.C. § 1346 (United States as a defendant), and 5 U.S.C. §§ 701-

12    706 (Administrative Procedure Act).  An actual controversy exists between the parties within the

13    meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and

14    other relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 705-706.

15        11.     Defendants' issuance of the Rule on March 4, 2019, constitutes a final agency

16    action and is therefore judicially reviewable within the meaning of the Administrative Procedure

17    Act.  5 U.S.C. §§ 704, 706.

18        12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because this is a

19    judicial district in which the State of California resides and this action seeks relief against federal

20    agencies and officials acting in their official capacities.  *California*, 911 F.3d at 568-69.

21

22

23

---

24        [1] These interim final rules were the subject of preliminary injunctions entered by federal courts in California and Pennsylvania, and the final rules have been similarly enjoined.  *See State of California v. Health and Human Servs.*, 281 F. Supp.3d 806 (N.D. Cal. 2017), *aff'd in part, vacated in part and remanded by California v. Azar*, 911 F.3d 558 (9th Cir. 2018) (upholding preliminary injunction against interim final rules), *State of California v. Health and Human Servs.,* 351 F. Supp.3d 1267 (N.D. Cal. 2019) (granting motion for preliminary injunction against final rules); *Pennsylvania v. Trump*, 281 F. Supp.3d 553 (E.D. Pa. 2017), *appeal filed*, 3rd Cir. Nos. 17-3752 (Dec. 21, 2017) and 18-1253 (Feb. 15, 2018) (interim final rules), 2019 WL 190324 (E.D. Pa. Jan. 14, 2019) (issuing nationwide injunction against final rules).

**INTRADISTRICT ASSIGNMENT**

13.     Pursuant to Civil Local Rules 3-5(b) and 3-2(c), there is no basis for assignment of this action to any particular location or division of this Court.

**PARTIES**

14.     Plaintiff the State of California, by and through Attorney General Xavier Becerra, brings this action.  The Attorney General is the chief law officer of the State and has the authority to file civil actions in order to protect the health and welfare of Californians and advance the State's interest in protecting women's access to critical healthcare services.  Cal. Const., art. V, § 13; Cal. Bus. & Prof. Code § 321.  This challenge is brought pursuant to the Attorney General's independent constitutional, statutory, and common law authority to represent the public interest.

15.     Governor Gavin Newsom is the chief executive officer of the State.  The Governor is responsible for overseeing the operations of the State and ensuring that its laws are faithfully executed.  As the leader of the executive branch, the Governor is the chief of California's executive branch agencies, including those whose injuries are discussed in this Complaint.  Cal. Const., art. V, § 1.

16.     The State of California has an interest in ensuring that healthcare is both available and accessible, including women's reproductive care.  Healthcare is an important function within the police powers of the States.  California relies on Defendants' compliance with the requirements of the APA in order to meaningfully participate in an impartial and public decision-making process and to implement federal programs, including Title X, according to reasonable rules that are consistent with federal law.

17.     Implementation of Defendants' illegal Rule will cause immediate and irreparable injuries to California's sovereign, quasi-sovereign, and proprietary interests.  The Rule will have an adverse impact on public health in California by curtailing residents' access to quality reproductive healthcare, interfering with doctor-patient relationships, and destabilizing existing Title X provider networks.  The Rule will increase unwanted pregnancies, resulting in new burdens and costs for California women, the state's Medicaid program, and public health

generally. California's state agencies will be impacted by this rule as they seek to implement California laws relating to nondiscrimination and access to state family planning programs.

18.     Defendant Alex Azar is Secretary of HHS and is sued in his official capacity. Secretary Azar is responsible for implementing and fulfilling HHS's duties under the Constitution and the APA.

19.     Defendant HHS is an agency of the United States government and bears responsibility, in whole or in part, for the acts complained of in this Complaint. The Office of the Assistant Secretary for Health is an entity within the HHS.

# BACKGROUND

## I.     TITLE X AND RELATED FEDERAL REGULATIONS AND LAWS

20.     In July 1969, President Richard Nixon wrote in a message to Congress that "no American woman should be denied access to family planning assistance because of her economic condition. I believe, therefore, that we should establish as a national goal the provision of adequate family planning services within the next five years to all those who want them but cannot afford them."

21.     Congress responded in 1970 by enacting Title X of the Public Health Services Act (PHSA), 42 U.S.C. §§ 300-300a-6 (the Act), a bipartisan effort to provide federal funding for family planning services. The Act authorizes the Secretary to "make grants to and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of volunteer family planning projects which shall offer a broad range of acceptable and effective family planning methods and services (including natural family planning methods, infertility services, and services for adolescents)." 42 U.S.C. § 300(a). In addition to establishing the federal Office of Population Affairs (OPA), the division of HHS that administers Title X, Congress' stated intentions included:

(l) to assist in making comprehensive voluntary family planning services readily available to all persons desiring services;
(2) to coordinate domestic population and family planning research with the present and future needs of family planning programs;
(3) to improve administrative and operational supervision of domestic family planning services and of population research programs related to such services;

1
2
3
4
5

(4) to enable public and nonprofit private entities to plan and develop comprehensive programs of family planning services;
(5) to develop and make readily available information (including educational materials) on family planning and population growth to all persons desiring such information;
(6) to evaluate and improve the effectiveness of family planning service programs and of population research; [and]
(7) to assist in providing trained manpower needed to effectively carry out programs of population research and family planning services[.]

6

Pub. L. No. 91-572 § 2, 84 Stat. 1504 (1970).

7
8
9
10
11

22.     Almost fifty years after its original passage, Title X is a public health triumph, having helped create a strong network of providers committed to supporting the delivery of quality preventive health services, including reproductive care.  Nationally, more than four million Americans rely on affordable family planning services that are funded by Title X; including more than one million patients in California alone.

12
13
14
15
16
17
18
19

23.     According to OPA, Title X is the only federal program dedicated solely to supporting the delivery of family planning and related preventive health care.  It is designed to provide contraceptive supplies and information to all who want and need them, with priority given to persons from low-income families.  In addition to offering a broad range of effective and acceptable contraceptive methods on a voluntary and confidential basis, Title X-funded service sites provide contraceptive education and counseling; breast and cervical cancer screening; sexually transmitted disease (STD) and human immunodeficiency virus (HIV) testing, referral, and prevention education; and pregnancy diagnosis and counseling.

20
21
22
23

24.     Title X gives the Secretary authority to promulgate grant making regulations, 42 U.S.C. § 300a-4(a), and the Secretary first issued detailed regulations governing grant-making when the Title X program began in 1971.  *See* 36 Fed. Reg. 18467 (Sept. 15, 1971) (setting forth initial evaluation criteria).

24
25
26
27

25.     The Title X statute lists four factors that the Secretary "shall take into account" in making grant awards: "the number of patients to be served, the extent to which family planning services are needed locally, the relative need of the applicant, and its capacity to make rapid and effective use of such assistance."  42 U.S.C. § 300(b).

28

8

26.     Eligible projects must be "voluntary family planning projects consisting of the educational, comprehensive medical, and social services necessary to aid individuals to determine freely the number and spacing of their children." 36 Fed. Reg. at 18,466; 42 C.F.R. § 59.1.  Prior to the Rule, each project had to "provide a broad range of acceptable and effective medically approved family planning methods (including natural family planning methods) and services (including infertility services and services for adolescents)." 42 C.F.R. § 59.5 (Mar. 1, 2019).

27.     Former federal regulations required that Title X family planning grantees must "[o]ffer pregnant women the opportunity to be provided with information and counseling regarding . . . [p]regnancy termination." *Id*. at § 59.5(a)(5)(i) (Mar. 1, 2019).  If a pregnant woman requests such information, the Title X grantee was required to "provide neutral, factual information and nondirective counseling." *Id*. at § 59.5(a)(5)(ii).

28.     Section 1008 of the PHSA prohibits Title X funds from being "used in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6.  As the Supreme Court has recognized, however, Title X "expressly distinguishes between a Title X *grantee* and a Title X *project*." *Rust v. Sullivan*, 500 U.S. 173, 196 (1991) (emphasis in the original).  While upholding a prior attempt at a Title X gag rule, the Court explained that the "Title X grantee can continue to perform abortions, provide abortion-related services […] it simply is required to conduct those activities through programs that are separate and independent from the project that receives Title X funds." *Id*. (citing 42 C.F.R. § 59.9 (1989)).

29.     Despite the Supreme Court's decision in *Rust*, the 1988 gag rule was short-lived.  The 1988 regulations were never fully implemented, and in 1993 HHS completely rescinded them, concluding that they "inappropriately restrict[ed] grantees." 58 Fed. Reg. 7462, 7462 (Feb. 5, 1993).

30.     The Court in *Rust* had found itself "unable to say that the Secretary's construction [in the 1988 regulations] of the prohibition in § 1008 to require a ban on counseling, referral, and advocacy within the Title X project is impermissible." 500 U.S. at 184.  Starting in 1996, however, Congress clarified the law by routinely requiring as part of Title X appropriations that "all pregnancy counseling shall be nondirective." *See*, *e.g*., Continuing Appropriations Act, 2019,

P.L. 115-245, Div. B, Title II, §§ 207 and 208 (2018); Consolidated Appropriations Act, 2018, P.L. 115-141, Div. H, Title II, 132 Stat. 348, 716-17 (2018); Consolidated Appropriations Act, 2017, P.L. 115-31, Div. H, Title II, 131 Stat. 521 (2017).

31.     According to HHS regulations issued in 2000, Title X grantees' abortion activities must be "separate and distinct" from their Title X project activities.  HHS, OPA, "Provision of Abortion-Related Services in Family Planning Services Projects," 65 Fed. Reg. 41282 (July 3, 2000).  These well-established rules permit shared facilities that host Title X programs and provide for abortion care "so long as it is possible to distinguish between the Title X supported activities and non-Title X abortion-related activities." *Id.*  Common waiting rooms, common staff, and maintenance of a single filing system are all permissible as long as costs are properly pro-rated or allocated between Title X projects and other programs.

32.     OPA provides strict oversight of projects that receive Title X grants to ensure that federal funds are used appropriately and that funds are not used for any ineligible activities, such as abortion services.  Existing safeguards to maintain this separation include: (1) careful review of grant applications to ensure that the applicant understands and has the capacity to comply with all requirements; (2) independent financial audits to examine whether there is a system to account for program-funded activities and non-allowable program activities; (3) yearly comprehensive reviews of the grantees' financial status and budget report; and (4) periodic and comprehensive program reviews and site visits by OPA regional offices.

33.     The basic primary and preventive health care services funded by Title X programs include well-woman exams, lifesaving cervical and breast cancer screenings, birth control, contraception education, and testing and treatment for sexually transmitted infections (STIs), including HIV.

34.     Title X-funded programs are specifically focused on pre-pregnancy care.  Patients receive preventive healthcare such as preventive screenings, tests, and counseling related to family planning.  When a woman becomes pregnant, under the previous program rules, all Title X providers referred all pregnant patients to high-quality, non-Title X programs to handle their pregnancy-related needs, including both prenatal care and abortion-related services.

35.     Prior to the issuance of the new Rule, OPA had routinely set forth specific clinical standards for Title X programs, requiring grantees to adhere to the federal Quality Family Planning Guidelines issued by the Centers for Disease Control and Prevention (CDC) which set forth broadly accepted, evidence-based standards for high-quality clinical practice regarding the provision of family planning services.[2]  *See* "Providing Quality Family Planning Services" (hereinafter Quality Family Planning Guidelines), 63:4 Morbidity and Mortality Weekly Report (Apr. 25, 2014).  These guidelines are nationally recognized protocols developed in collaboration with professional medical associations like the American College of Obstetricians and Gynecologists (ACOG).  The federal OPA required these standards for Title X care by incorporating the Quality Family Planning Guidelines into its program guidance for Title X services projects, "Program Requirements for Title X Funded Family Planning Projects" ("Program Requirements"), also published in April 2014.

36.     According to these guidelines, quality family planning services take a "client-centered approach" in which "the client's primary purpose for visiting the service site must be respected."

37.     The Quality Family Planning Guidelines explain that pregnancy testing and counseling services are a "core" part of "family planning services, in accordance with recommendations of major professional medical organizations."  To that end, after administration of a pregnancy test, providers are instructed that the "test results should be presented to the client, followed by a discussion of options *and appropriate referrals*."  (Emphasis added.)  The Quality Family Planning Guidelines further recommend that "[r]eferral to appropriate providers of follow-up care should be made at the request of the client, as needed," and "[e]very effort should be made to expedite and follow through on all referrals."

38.     According to the Quality Family Planning Guidelines, when giving referrals, family planning providers should "provide a resource listing or directory of providers to help the

---

[2] HHS continues to refer Title X providers to the Quality Family Planning Guidelines.  *See* HHS Office of Population Affairs, https://www.hhs.gov/opa/guidelines/clinical-guidelines/quality-family-planning/index.html (last visited March 3, 2019).

1  client identify options for [pregnancy] care." This instruction is not limited to only those women

2  who choose to continue with their pregnancy. Rather, the CDC instruction broadly instructs that

3  providers give referrals, "at the request of the client," including for termination of pregnancy.

4      39.    When referring pregnant clients, Title X-funded programs act in accordance with

5  evidence-based clinical standards for nondirective counseling. These standards have been

6  developed in order to provide quality family planning services in a safe, effective, and client-

7  centered manner. The American College of Obstetricians and Gynecologists, the American

8  College of Physicians, and the American Academy of Family Physicians all endorse nondirective

9  options counseling, including referral to appropriate providers, as the most clinically appropriate

10  role for providers caring for a patient who is facing an unexpected pregnancy.

11      40.    These standards allow patients to trust their Title X providers and ensure the

12  delivery of unbiased information regarding their reproductive and sexual health. This high

13  standard of care helps patients make the best decisions for themselves and their loved ones when

14  facing an unintended pregnancy, or needing to make other time-sensitive decisions about their

15  reproductive health.

16  **II.   CALIFORNIA LAWS, REGULATIONS, AND PROGRAMS**

17      41.    California state laws and policies recognize the importance of protecting a

18  woman's right to reproductive healthcare, and specifically a women's right to abortion. In 1972,

19  California voters amended the state Constitution to include a right of privacy among the

20  inalienable rights protected by article I, section 1. *Chico Feminist Women's Health Cent. v. Butte*

21  *Glen Med. Soc'y*, 557 F. Supp. 1190, 1201-1202 (E.D. Cal. 1983) (citing *White v. Davis*, 13 Cal.

22  3d 757, 774 (1975)). Under article I, section 1, "all women in this state - rich and poor - alike

23  possess a fundamental constitutional right to choose whether or not to bear a child." *Comm. to*

24  *Defend Reprod. Rights v. Myers*, 29 Cal. 3d 252, 262 (1981). Private parties cannot interfere with

25  the Constitutional right to procreative choice. *Chico*, 557 F. Supp. at 1202-03; *Hill v. Nat'l*

26  *Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 20 (1994). In addition, the Constitutional right of a

27  woman to decide whether to bear a child or terminate a pregnancy is protected from State

28  interference. *Chico*, 557 F. Supp. at 1202; *Myers*, 29 Cal. 3d at 284.

42.     Echoing these constitutional protections, the state Reproductive Privacy Act of 2002 (RPA) declared as state law that "[e]very woman has the fundamental right to choose to bear a child or to choose and to obtain an abortion[.]"  Cal. Health & Saf. Code § 123462(b).  The RPA expressly provides that: "The state may not deny or interfere with a woman's right to choose or obtain an abortion [. . .] ."  *Id.* § 123466.  This requirement applies to all Medi-Cal managed care health plans, as state contractors.  Cal. Dept. of Health Care Servs., All Plan Letter 15-020 (Sept. 30, 2015).

43.     California law also requires that a female survivor of sexual assault shall be provided with "the option of postcoital contraception by a physician or other health care provider" and that "[p]ostcoital contraception . . . be dispensed by a physician or other health care provider upon the request of the victim at no cost to the victim."  Cal. Penal Code § 13823.11(e)(1), (e)(2), (g)(4)(A), (g)(4)(B).

44.     California's recent Contraceptive Coverage Equity Act further protects women's access to contraceptive care by requiring certain private health plans and policies as well as Medi-Cal managed care health plans to provide coverage for all prescribed, FDA-approved contraceptives with no cost-sharing.  Cal. Health & Saf. Code § 1367.25; Cal. Ins. Code § 10123.196; Cal. Welf. & Inst. Code § 14132.

45.     California's longstanding Unruh Civil Rights Act since 1959 provides that all persons "are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."  Cal. Civ. Code § 51(b).  Characteristics protected under the Unruh Civil Rights Act are sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, and immigration status.  *Id.*  "Sex" is defined to include, but not be limited to, gender, gender identity, gender expression, pregnancy, childbirth, and medical conditions related to pregnancy or childbirth.  Cal. Civ. Code § 51(e)(5).

46.     California regulates its registered physicians, licensed midwives, registered nurses, nurse-midwives, and licensed vocational nurses.  Cal. Bus. & Prof. Code §§ 101, 125.6; Cal. Penal Code § 13823.11(e) and (g)(4); Cal. Health & Saf. Code §§ 10123.196, 1367.25,

123420(d).  State boards establish minimum qualifications and levels of competency in order to "protect the people of California" and in order "to provide safe and effective services to the public."  Cal. Bus. & Prof. Code § 101.6.  Failure to meet these minimum qualifications exposes a regulated professional to disciplinary action for unprofessional conduct, including incompetence or gross negligence.  *See*, *e.g.*, *id.* § 2761; *see also* Cal. Bus. & Prof. Code § 733 (a California licensee "shall not obstruct a patient in obtaining a prescription drug or device that has been legally prescribed or ordered for that patient").

47.     California has sovereign authority and quasi-sovereign interests in regulating healthcare, criminal acts, and California-licensed entities and professionals.  *See New York v. United States*, 505 U.S. 144, 155-56 (1992); Cal. Bus. & Prof. Code §§ 101, 101.6, 125.6; 733 (a California licensee "shall not obstruct a patient in obtaining a prescription drug or device that has been legally prescribed or ordered for that patient"); 2761; Cal. Penal Code § 13823.11(e) and (g)(4); Cal. Health & Saf. Code §§ 10123.196, 1367.25, 123420(d); Cal. Civ. Code § 51; *N. Coast Women's Care Med. Group, Inc. v. San Diego County Superior Court*, 44 Cal.4th 1145, 1158 (2008).  "[T]he structure and limitations of federalism . . . allow the States great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons."  *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (internal quotation marks and citation omitted).

48.     States have a sovereign interest in the creation and enforcement of a legal code.  Pursuant to that interest, California has an interest in challenging HHS's acts that undermine California's authority to regulate matters that California controls and frustrate enforcement of state law where California statutes provide for the administration and regulation of state-licensed healthcare professionals and businesses.

## III.  SCOPE AND IMPACT OF CURRENT TITLE X PROGRAM

### A.     Scope of California's Title X Program and Related State Programs

49.     California is home to the nation's largest Title X program, which collectively serves more than one million patients annually—over 25% of all Title X patients nationwide.  Essential Access Health is California's sole Title X grantee.  This non-profit organization

14

administers sub-grants to a diverse array of qualified family planning and related preventive

health service providers through 70 different healthcare organizations, operating 356 clinic sites

in 38 of California's 58 counties.  In 2017, OPA awarded Essential Access Health $20.5 million

dollars to support access to high-quality family planning and sexual healthcare across the state.

50.    Essential Access Health's sub-grantees include:  federally qualified health centers

(FQHCs), community-based health care providers that provide primary care to underserved and

uninsured individuals regardless of their ability to pay (59% of all California Title X providers);

family planning and women's health centers, such as Planned Parenthood affiliates (11%); faith

and community-based education and outreach organizations (13%); city and county health

departments (10%); community action partnerships and economic opportunity commissions (3%);

Native American health centers and outreach organizations (3%) and hospitals (1%).

51.    In addition to California's extensive federally funded Title X program, state

residents have access to family planning services through California's state-funded Family

Planning, Access, Care, and Treatment (Family PACT) program.  Family PACT is administered

by the state Office of Family Planning (OFP), an entity within the California Department of

Health Care Services (DHCS).

52.    Family PACT is California's innovative approach to provide comprehensive

family planning services.  The goal of Family PACT is to promote optimal reproductive health

and to reduce unintended pregnancies by lowering the barriers that many women with unmet

needs face in obtaining family planning services.  All current Title X-funded providers screen

clients for eligibility for Family PACT.

53.    Family PACT is available to eligible low-income (under 200% of federal poverty

level) men and women who are residents of California, who do not have access to family

planning coverage (or they meet the criteria specified for eligibility) and have a medical necessity

for family planning services.  As of Fiscal Year 2015-2016, the program serves 1.15 million

eligible men and women of childbearing age through a network of 2,500 public and private

clinicians.  Services include comprehensive education, assistance, and services related to family

planning.

54.     Essential Access Health requires that all of its Title X subgrantees also be Family PACT providers.  This requirement ensures that California's Title X providers adhere to the same minimum clinical standards as other California Medicaid providers.  The Family PACT provider agreement incorporates all applicable federal and state laws, such as the Reproductive Privacy Act.

55.     California state standards require that providers electing to participate in Family PACT must provide the full scope of family planning, education, counseling, and medical services specified by Family PACT, either directly or by referral, consistent with standards of care issued by DHCS.  Cal. Welf. & Inst. Code § 24005(c).  These standards include that Long Acting Reversible Contraception (LARC), e.g., intrauterine devices (IUDs) and contraceptive implants, must be offered onsite or by prescription.  Only licensed personnel with family planning skills, knowledge and competency may provide the family planning medical services covered by Family PACT.  Cal. Welf. & Inst. Code § 24005(b).

56.     Title X is available to pay for services for women who are ineligible for Family PACT.  Individuals with incomes between 200 and 250% of the federal poverty level (between $24,280 and $30,350 for individuals in 2018) who need reproductive healthcare services are eligible for services through Title X, but not Family PACT.

57.     Family PACT and Title X patients who become pregnant are generally eligible for services under California's Medicaid program, known as Medi-Cal.  Most pregnancy-related services are paid for with a combination of state and federal funds.  California pays for abortion services for all Medi-Cal enrollees, using state funds only.  Medi-Cal enrollees are not charged co-insurance or co-payments, nor do they need to pay out-of-pocket costs for abortion services.

58.     Despite these safety net healthcare programs, there is still unmet need in California for family planning services.  In 2014, 2.6 million California women were still in need of publicly funded family planning based on income, age and health status, and the State's family planning network was only able to meet 50% of this need.

1

**B.    Benefits of California's Existing Title X Network**

2          59.    The services provided by California's existing network of qualified Title X

3   providers have a significant, positive impact on family health and well-being, and by extension

4   the state's overall public health generally.  In recent decades, a substantial body of scientific

5   evidence has developed to show that Title X programs operating according to long-standing rules

6   currently in effect are clinically effective and succeed in helping individuals and families achieve

7   their desired number and spacing of children.

8          60.    California's current network of Title X-funded clinics provides a broad range of

9   family planning services, and serves as an access point for more than one million Californians

10  annually to receive quality sexual and reproductive healthcare.  These patients were 88% female

11  and 12% male; 66% were under the age of thirty; and 73% had family incomes below the federal

12  poverty line ($12,140 for an individual in 2018).

13         61.    California's current network of Title X-funded clinics also provides preventive

14  care services, such as screening for breast and cervical cancer, as well as education regarding

15  prevention of sexually transmitted diseases and HIV.  In 2017, California recipients of Title X

16  funds provided more than 1.6 million family planning visits, including more than 148,000 pap

17  tests, more than 118,000 clinical breast exams, more than 642,000 chlamydia screenings, more

18  than 700,000 gonorrhea screenings, and more than 341,000 HIV tests.

19         62.    Title X-funded family planning providers have been shown to improve access to

20  high quality family planning services, including contraceptives, and related preventive health

21  services.

22         63.    Title X clinics tend to be strategically located in areas where the number of women

23  in need of publicly funded family planning services is high.

24         64.    California's Title X providers deliver a higher quality of services compared to

25  other publicly funded family planning providers.  The current network of Title X clinics is more

26  likely than other publicly funded family planning providers to provide patients with on-site,

27  specialized services that have a higher up-front cost, but are more effective and cost-efficient in

28  the long run, such as vasectomies or LARCs.  And Title X providers have greater adherence than

other publicly funded family planning providers to chlamydia screening guidelines that require different levels of screening for different age groups.

65.    California's Title X providers are more likely than other publicly funded family planning providers to participate in clinical training opportunities.  These training opportunities help Title X clinicians offer higher quality, evidence-based services.  Title X-funded web-based training opportunities play a particularly valuable role in rural and/or small clinics.

66.    California's Title X providers are more likely than other publicly funded family planning providers to use advanced technologies in their clinics.

67.    California's Title X providers are more likely than other publicly funded family planning providers to provide outreach services.  In fiscal year 2017, Title X funding in California supported outreach that connected more than 500,000 individuals with information about family planning services, including where and how to access these services in their communities.

68.    California's Title X providers are more likely than other publicly funded family planning providers to provide outreach services to patients who may otherwise have difficulty connecting with healthcare services.  These Title X-funded clinics have greater proportions of bilingual staff, and are more likely to provide outreach to vulnerable or hard-to-reach populations, such as adolescents; males; lesbian, gay and transgender individuals; persons experiencing homelessness, those with limited English proficiency; migrant workers; individuals coping with alcohol and substance abuse; refugees and immigrants; and persons with disabilities.

69.    California's Title X funds help providers offer extended clinic hours, compared to other providers that receive public funds.  California's Title X providers are also more likely than other publicly funded family planning providers to provide sexual and reproductive health education to their communities.  Health education helps connect individuals to needed healthcare and information needed to support their reproductive health goals.

70.    Use of contraceptive services has resulted in lower unintended pregnancy and abortion rates in the United States, including California.  By allowing women to avoid unintended pregnancies and to time and space wanted pregnancies, contraception helps avoid pregnancies

that occur too early in a woman's life or that are spaced too closely.  In doing so, contraception improves health outcomes.

71.     In 2010, an estimated 45% of unintended pregnancies in California ended in abortion.  The risk of unintended pregnancy is greatest for women who are young, women of color, those who have low incomes, live in rural communities, or those who have limited education.

72.     Unintended pregnancies are associated with risks to maternal health and adverse birth outcomes, including preterm birth, low birth weight, still birth; and negative psychological outcomes for both mothers and children.

73.     Contraceptive use also benefits women's health overall.  Contraceptive use can prevent preexisting health conditions from worsening and new health problems from occurring, because pregnancy can exacerbate existing health conditions such as diabetes, hypertension and heart disease.  Contraception is regularly used to treat menstrual disorders and pelvic pain.  Long-term use of oral contraceptives has been shown to reduce women's risk of endometrial cancer, pelvic inflammatory disease, and some breast diseases.

74.     The benefits of Title X extend to society at large.  Access to contraceptive services benefits women in particular, helping narrow the gender wage gap.  Access to contraception helps women choose to delay childbearing and pursue additional education, spend additional time in their careers, and have increased earning power over the long-term.  An estimated one-third of the wage gains women have made since the 1960s are the result of access to oral contraceptives.

75.     Contraceptive use achieves significant cost savings as well.  In 2002, the direct medical cost of unintended pregnancy in the United States was nearly $5 billion, with the cost savings due to contraceptive use estimated to be $19.3 billion.

76.     The State of California directly benefits from these cost savings.  The potential gross public savings from preventing unintended pregnancies in California alone would have been an estimated $1.3 billion in 2010 alone.

77.     More broadly, for every dollar invested in publicly funded family planning programs, federal and state governments saved an estimated $7.09 in 2010 in Medicaid-related

costs that would otherwise have been associated with unintended pregnancies as well higher rates of adverse birth effects, sexually transmitted diseases, and cervical cancer.

## IV.  HHS'S FLAWED AND UNLAWFUL NEW RULE

78.     The Rule was originally proposed in a Notice of Proposed Rulemaking (NPRM) on June 1, 2018.  83 Fed. Reg. 25502, RIN 0937-ZA00.

79.     Prior to promulgating the Rule, Defendants failed to meet or convene publicly with leading healthcare experts such as the American Academy of Pediatrics, the American Association of Family Physicians, the American College of Physicians, or the National Association of Nurse Practitioners in Women's Health.   Yet Defendants engaged in numerous meetings with proponents of the Rule who are not experts in the provision of women's reproductive healthcare.

80.     Anticipating the NPRM, California wrote to Defendants on May 24, 2018 requesting a meeting with HHS to discuss the Rule and its effects.  On July 18, 2018, California along with Massachusetts, New Jersey, Oregon, Vermont, and Washington wrote to Defendants requesting an extension of the comment period.  Defendants submitted these letters as "comments" into the Federal Register, but effectively denied the requests.

81.     In response to the NPRM, HHS received more than 500,000 comments, many describing a number of grave concerns about the regulation and its impact.  California, along with Delaware, Hawai'i, Illinois, Iowa, Maine, Maryland, Minnesota, New Jersey, New Mexico, North Carolina, and the District of Columbia filed a multistate comment letter explaining that the Rule, if implemented, would create barriers to women's healthcare, including abortion.  Major medical health services provider organizations and experts in reproductive health filed comments similarly opposing the Rule as medically misguided and/or contrary to law.

82.     On March 4, 2019, HHS took final agency action when it caused the Rule to be published as a final rule in the Federal Register.

83.     In promulgating the Rule, HHS stated its intent to revise existing regulations in order "to ensure compliance with, and enhance the implementation of" the provision of the Public

Health Services Act which prohibits use of Title X funds from being used in "programs where abortion is a method of family planning."  84 Fed. Reg. at 7714.

84.     In doing so, however, HHS failed to identify any evidence showing that funds appropriated for Title X were, in fact, being illegally used by recipients of those funds, or any other evidence warranting such a drastic change in regulation. In the preamble to the final Rule, HHS acknowledged that the examples it had cited relating to improper use of funds involved Medicaid, not Title X grant funds.  84 Fed. Reg. at 7725.

85.     To the contrary, substantial evidence shows that Title X grantees and subgrantees consistently keep clear and proper separation between their Title X projects and other programs that grantees may operate.

86.     In addition to failing to identify any substantial evidentiary basis supporting the Rule, HHS essentially ignored commenters' serious and substantial concerns about the regulation. Key problematic features of the new Rule are described below.

Separation Requirement

87.     The Rule mandates a new "physical and financial separation" between a Title X program and a facility that engages in "abortion activities."  Factors relevant to the determination of whether the Title X program is physically and financially separate include the existence of separate waiting, consultation, examination, and treatment rooms, office entrances and exits, phone numbers, email addresses, educational services, websites, personnel, electronic or paper-based healthcare records, and workstations.  42 C.F.R. § 59.15.

88.     These separation requirements apply not only to the minority of Title X providers that actually offer abortion services.  They also apply to (a) all Title X-funded projects that give "referrals" to patients who wish to choose an abortion, and (b) any and all Title X projects, like Essential Access Health, that engage in separately funded advocacy or public education activities that Defendants may determine "promote" abortion.  *See* 42 C.F.R. § 59.15 (requiring physical and financial separation from all "activities which are prohibited under […] §§ 59.13, 59.14, and 59.16 of these regulations").

89.     To obtain Title X funding, providers will effectively have to open a second clinic to continue to provide even a *referral* to patients who wish to choose an abortion—an option that is entirely impracticable.

90.     In promulgating the new physical separation mandate, HHS ignored— or worse, relied on— substantial evidence that this provision would cause well-qualified providers to leave the Title X program and that this loss would impede women's access to reproductive health services.

91.     For example, the American Public Health Association explained in its July 30, 2018 comments on the proposed Rule that in states that have already eliminated Planned Parenthood from their family planning programs, the "public health results have been disastrous," leaving many people without access to care.

Gag Rule on Healthcare Information

92.     The Rule does not allow providers to "promote, refer for, or support abortion as a method of family planning." 42 C.F.R. §§ 59.5(a)(5), 59.14(a).

93.     Even when a woman wishes to exercise her lawful choice to access an abortion, the provider is prohibited from providing her with a specific list of healthcare entities that perform abortions, arranging her appointment, or assisting with needed transportation. 42 C.F.R. § 59.14(a) (prohibiting Title X programs from taking "any other affirmative action to assist a patient to secure such an abortion"). At most, the healthcare provider may provide a list of "comprehensive health services providers (including providers of prenatal care)." 42 C.F.R. § 59.14(b)(ii). A Title X provider may also choose to exclude providers that perform abortion entirely from the list. 42 C.F.R. § 59.14(b)(2).

94.     The Rule's mandate that the provider lists given to women seeking an abortion contain only providers that also provide "comprehensive primary care" seems to mean that a specialty clinic or individual provider who provides abortions and other healthcare services, but not "comprehensive primary care," would be ineligible to be placed on a list, even if they were the most convenient and/or most highly qualified provider offering the abortion care services that the Title X patient seeks.

22

95.     The Rule not only authorizes Title X doctors and nurses to give a misleading provider list, but it also prohibits those clinicians from informing their patient—who has requested a referral for an abortion (a time sensitive medical procedure)—that the list includes healthcare facilities that do not provide abortions.  "Neither the list nor project staff may identify which providers on the list perform abortion."  42 C.F.R. § 59.14(c)(2).  As the American College of Obstetricians and Gynecologists (ACOG) explained in its July 31, 2018, comment to HHS, such a regulation "restricts the ability of physicians to provide clear, direct information to patients, and it even goes so far as to actively require physicians to withhold full and accurate information and provide referrals to providers that do not offer the service requested by the patient."

96.     Nothing in the Rule requires that Title X providers notify women of this drastic change in referral practices.

97.     The Rule steers all pregnant women toward prenatal care and social services, regardless of whether the patient's choice is to obtain information regarding pregnancy termination only.

98.     The Rule applies exclusively to women's reproductive health care, by placing an artificial and unnecessary limit on what information a provider can share with his or her female patients in making referrals.  No limits are placed on referrals for any family planning services needed by men.

99.     As the administrative record showed, the Rule runs counter to accepted principles of medical ethics and to accepted standards for clinical practice in the area of family planning and reproductive healthcare.

100.     Defendants ignore the CDC's Quality Family Planning standards for high quality, evidence-based clinical practice regarding the provision of family planning services, among other sources of mainstream guidance.  Title X providers who abide by the Rule would be in violation of these guidelines.

101.     In promulgating the Rule, HHS ignored the concerns of the medical community that the Rule would interfere with the relationships between health providers and their patients,

23

1   and impede women's access to reproductive health services.  The major national professional

2   bodies who commented on the rule, including the American Medical Association, the American

3   College of Nurse-Midwives, ACOG, the American Public Health Association, the National

4   Family Planning & Reproductive Health Association, universally concur:  the Rule contravenes

5   medical ethics, which require doctors and other health professionals to put patients' needs first,

6   and undermines doctors and other health professionals' abilities to provide high quality, evidence-

7   based medical care.

8          Removing Requirements for Nondirective, Medically Approved Family Planning

9   Healthcare

10         102.    The Rule removes the requirements that Title X providers offer a "broad range of

11  medically approved family planning methods," eliminating the words "medically approved."  42

12  C.F.R. § 59.5(a)(1).

13         103.    A facility that may be eligible under this criterion, such as a so-called crisis

14  pregnancy center, may have no licensed medical providers, and is now potentially eligible for the

15  Title X program despite offering women patients only abstinence or natural family planning as

16  methods of family planning.

17         104.    The Rule removes the requirement that Title X providers offer nondirective

18  pregnancy options counseling that includes information about prenatal care and delivery,

19  adoption, and pregnancy termination, if requested.  84 Fed. Reg. at 7716.

20         105.    The Rule also allows use of Title X funds toward entities that promote only

21  abstinence, or only adoption, as methods of family planning.

22         106.    Moreover, the Rule effectively prohibits nondirective counseling by prohibiting

23  referrals for abortion, by issuing a vague prohibition on providers who "encourage" or "support"

24  abortion (inhibiting providers' ability to provide respectful, client-centered counseling), by

25  banning referrals for abortion, but not other post-conception care, and by requiring that pregnant

26  patients be referred to a health care provider for "medically necessary prenatal health care."  42

27  C.F.R. § 59.14(b).  None of these limitations can be squared with an evidence-based

28

understanding of nondirective options counseling.  They leave providers with unclear guidance, potentially causing providers to forgo discussions altogether for fear of violating the Rule.

107.    At numerous points, Defendants misleadingly imply that there are no standard or widely accepted norms within the medical community about what constitutes "medically approved," by stating, for example, "different medical doctors and professional organization may differ on which methods of health care they approve, including different methods of family planning." 84 Fed. Reg. at 7741.

108.    These changes usurp Congressional authority by removing the statutory mandate that Title X provide comprehensive, evidence-based reproductive healthcare.

109.    The removal and weakening of requirements for comprehensive, evidence-based reproductive healthcare apply exclusively to care provided to women.

110.    The administrative record shows that the aspects of the Rule that remove or weaken requirements regarding comprehensive, evidence-based reproductive care run counter to accepted principles of medical ethics and to accepted standards for clinical practice in the area of reproductive healthcare.

111.    Removal or weakening of Title X requirements regarding comprehensive, evidence-based reproductive care also run counter to the Quality Family Planning guidelines and the weight of the administrative record.

112.    HHS ignored evidence that nondirective care is considered high quality care.

113.    HHS ignored evidence that 65% of all U.S. women are currently using contraception; that nearly all women use contraception during their lifetime; and that the most popular methods of family planning are also those that are most effective.

114.    HHS ignored evidence that family planning providers who adhere to the long-standing Title X-requirements to provide nondirective care and offer a broad range of effective family planning methods offer higher quality care.

115.    HHS selectively relied upon statements such as that of the ACOG supporting inclusion of natural family planning as a method of contraception in order to misleadingly suggest

that those organizations view natural family planning as equally effective compared to other FDA-approved contraceptive methods.

116.    HHS ignored evidence that lower-quality family planning providers with a mission to prevent abortion who refuse to offer nondirective care have deceived and harmed women.

117.    In removing requirements for comprehensive, evidence-based reproductive healthcare, HHS ignored substantial evidence that these provisions would merely encourage the entry of lower-quality providers into the Title X program and impede women's access to quality reproductive health services.

Barriers to Care for Adolescents

118.    The Rule imposes numerous additional requirements that will affect minors seeking contraceptive services and the healthcare providers that provide them care.

119.    First, the Rule requires that a minor may be found to be financially eligible for subsidized Title X services only after documentation of "specific actions taken to encourage the minor to involve her/his family (including her/his parents or guardian) in her/his decision to seek family planning services."[3]  42 C.F.R. § 59.2.

120.    Even for minors who manage to pay for Title X services out-of-pocket, the Rule requires that providers document in the medical record the specific actions taken to encourage family participation or any specific reason why family participation was not encouraged.  *Id.*

121.    The administrative record shows that family participation is often not practicable for adolescents, for reasons other than abuse or incest.

122.    The record shows that providers who specialize in the treatment of adolescents overwhelmingly believe that the new requirements will create barriers to access to care for adolescents in need of reproductive health services.

123.    For example, according to the American Academy of Pediatrics and Society for Adolescent Health and Medicine's July 31, 2018 comment on the Rule, requiring clinicians to

---

[3] The only exception to this family involvement requirement is when the provider suspects child abuse or incest, has reported the situation to State or local authorities, and has documented that reporting in the record.

take "specific actions" to encourage family participation, even after they have learned that this involvement is not practicable, "is not only contrary to medical ethics, but it also undermines the relationship between the minor and the health care professional and is likely to drive some minors away from returning for critical health care services, including contraception and testing and treatment for sexually transmitted infections."

Limitation on Providers Who May Offer Pregnancy Options Counseling

124.     In addition to severely limiting the circumstances in which Title X providers may refer patients to abortion providers, the Rule provides that only doctors and nurses with advanced degrees may provide options counseling to pregnant women.

125.     Doctors and advance practice nurses with graduate degrees are often not the reproductive healthcare providers actually discussing options with the patient.  Nurses and health educators, among others, often provide such care, within their scope of practice and training.

126.     Counseling regarding medical options can be, and is, safely and effectively provided by clinicians with a variety of credentials, subject to appropriate training and supervision.

127.     In promulgating the new requirement that only doctors and nurses with graduate degrees may provide patients with options counseling or refer them to primary care services, HHS ignored evidence that such a provision would impede women's access to reproductive health services.  As the CEO of the Northeast Valley Health Corporation, an FQHC serving the San Fernando and Santa Clarita Valleys, explained in her July 30, 2018 comment, "health care professionals at Title X-funded health centers must be able to continue to work to the ceiling of their scope and training," otherwise the Rule will "interfere with the progress made in California and other states across the country to address workforce shortages."

128.     Furthermore, HHS's decision to allow doctors and nurses with graduate degrees, but not other well-trained professionals, to provide counseling for pregnant patients is not a logical outgrowth of the original proposal.

Limitation on So-Called "Infrastructure" Building

129.    The Rule also includes an unnecessary and arbitrary ban on use of Title X funds to "build infrastructure for purposes prohibited with these funds, such as support of the abortion business of a Title X grantee or subrecipient." 42 C.F.R. § 59.18(a).

130.    Defendants' evidence that Title X funds are being used to "build infrastructure" shows that those activities are consistent with the purposes of the Title X statute. The single, anecdotal example from 2007 cited by Defendants of so-called infrastructure building—the Los Angeles, California-based Venice Family Clinic's use of health educators wearing backpacks with condoms and educational materials to go out into the community, and to visit homeless shelters—shows that these funds are being used for purposes that are entirely consistent with the purposes of Title X.

131.    Far from supporting an "abortion business," 42 C.F.R. § 59.18(a), these so-called infrastructure building activities directly increase access to contraceptives, and decrease the need for abortion.

132.    Indeed, the Rule's ban on so-called "infrastructure building" and the new requirement that a majority of funds "provide direct services to clients" would severely limit the funding of the following: a wide variety of activities that make family planning services more readily available to persons desiring those services; improving the administration and operational supervision of those services; enabling public and nonprofit entities to plan and develop comprehensive programs of family planning services; developing educational materials and other information about family planning; evaluating and improving the effectiveness of family planning services programs; or assisting in providing training needed to carry out family planning programs. Yet each one of these activities fall within Congress' express purpose in enacting Title X. *See* ¶ 21, *supra*.

State and Local Costs and Impacts

133.    Furthermore, in issuing the Rule, HHS failed to fulfill its responsibilities for analysis and consultation under Executive Order 13132, which establishes requirements that an agency must meet when it promulgates a rule that imposes substantial direct requirement costs on

28

state and local governments or has federalism implications, and Executive Order 12372, which

requires intergovernmental review for certain programs and activities.  *See* 64 Fed. Reg. 43255

(Aug. 10, 1999) (policies that have federalism implications) and 47 Fed. Reg. 30959 (July 14,

1982) (requiring intergovernmental review for certain programs).

134.    HHS determined that the Rule did "not contain policies that have substantial direct

effects on the States, on the relationship between the National Government and the States, or on

the distribution of power and responsibilities among the various levels of government," and

concluded that the Rule instead merely represented "the Federal Government regulating its own

program."  84 Fed. Reg. at 7776.

135.    HHS's determination ignores substantial evidence of impacts on state and local

governments, and a disruption of the allocation of power and responsibilities among the various

levels of government.

136.    As California explained in its comments, the Rule will substantially interfere with

the State's policy-making discretion in the area of healthcare and will impose substantial costs on

state and local governments.

137.    In California, several local entities are Title X sub-recipients and will be subject to

the Rule.  For example, the San Francisco Department of Public Health (SFDPH), an agency of

the City and County of San Francisco, is one of Essential Access Health's subgrantees.  It has

used Title X funds to develop training programs that greatly improve the quality and effectiveness

of care offered at SFDPH family planning clinic sites across the county, as well as for ongoing

public education on topics relating to family planning and reproductive health, such as its recent

"Go Folic" project to increase awareness of the importance of folic acid supplementation in the

prevention of birth defects.  If the Rule is implemented, however, SFDPH will forego Title X

funds entirely, because of the restrictions on referrals for patients who choose to obtain an

abortion and because the costs of compliance with the new physical and financial separation

requirements are too high.  SFDPH explained in its July 31, 2018 comment letter that the Rule

would undermine access to critical preventive health services for some of San Francisco's most

vulnerable residents.

138.     HHS recognized these federalism implications in prior rulemaking on Title X, which included a federalism impact statement and invited States to consult with the federal agency in promulgating the final rule.  81 Fed. Reg. 61646 (Sept. 7, 2016).  Defendants offered no such opportunity for consultation prior to promulgating the current Rule.[4]

139.     The Rule demonstrates a clear intent to undermine the laws and policy choices made by California and similarly situated states that are consistent with Title X and the United States Constitution.

140.     Specifically, the Rule frustrates California law and policy choices that guarantee women's ability to choose abortion.  In doing so, it prevents California from protecting the health and safety of its residents, and induces Title X grant recipients to violate state consumer protection laws.

141.     Because California law prohibits licensed healthcare providers from discriminating or refusing service on the basis of a patient's pregnancy, California Civil Code section 51(e)(5), the Rule frustrates state licensing agencies' responsibilities (described in paragraph 46 above) to uphold and enforce California law.

142.     Finally, Title X grant recipients that act in accordance with the Rule's unreasonable, non-client-centered limitations on counseling and referrals—such as by providing misleading provider lists to women seeking to obtain abortion services—may violate California law and terms and conditions for Medi-Cal provider participation.

Improper Assessment of Costs of Rule

143.     More broadly, Defendants failed to assess the costs of the Rule.  Among Defendants' many unfounded assumptions are that the quality of Title X providers will improve as entities that cannot abide by the financial and physical separation requirements are excluded; that the Rule will cause more clients to be served, and reduce gaps in service; and that the Rule will not lead to an increase in unintended pregnancies.  84 Fed. Reg. at 7718, 7723, and 7741.

---

[4] California and other state Attorneys General did meet with the Office of Management and Budget on February 15, 2019, just prior to the release of the Rule.  HHS staff did not attend this meeting.

144.    In fact, none of these assumptions are reasonable in light of the evidence before the administration.  Quality and access to Title X-funded services will be reduced, and the number of Title X clients served will declined.  Unintended pregnancies will rise.  The costs and consequences will be serious, and are nowhere captured in Defendants' analysis.

Intent to Deprive Women of Access to High Quality Healthcare Services

145.    Overall, Defendants' rationale for the Rule is so implausible and disconnected from the weight of the evidence in the administrative record that there can be no other explanation for it apart from an intent to deprive women of a full range of high quality, needed reproductive healthcare services.

146.    For example, Defendants assert that HHS "does not agree that the final rule will negatively impact access to family planning," speculating (without any citation to evidence) that "more patients could have access to services" as a result of the Rule.  84 Fed. Reg. at 7785.  In California alone, however, dozens of clinics, medical providers, and statewide or regional professional organizations submitted comments speaking directly to this point.[5]  Their consensus: the Rule will reduce access to family planning services for the one million Title X patients who live in California.

147.    The Rule's many unsupported revisions effectively rewrite the Title X statute, operating well beyond the agency's regulatory authority, to effectuate a policy principle that relegates women's healthcare to second class status.

148.    Reorienting the Title X program toward lower-quality, less comprehensive and non-medically approved care is contrary to the ACA, recent appropriations bills, and the very purpose of Title X.

149.    Statements by President Trump support the conclusion that Defendants' stated rationale for the Rule change is pretextual.  In remarks at the Susan B. Anthony List's "Annual Campaign for Life Gala" on May 22, 2018, the President explained that the Title X rules

_____

[5] These comments include, for example, those of the California Medical Association, the California Primary Care Association, ACOG District IX, the California Academy of Family Physicians, the California Association of Nurse Practitioners, Community Health Councils, County Health Executives Association of California, the California Association of Public Hospitals and Health Systems, the Community Clinic Association of Los Angeles County.

represented a fulfillment of campaign promises and then claimed, without further evidence or explanation, that "American taxpayers" have been "forced to subsidize the abortion industry through Title X federal funding."

## V.   HHS'S RULE WILL HARM CALIFORNIA AND ITS RESIDENTS

150.    The Rule, if finalized, will force Title X funds recipients into an untenable position of deciding whether to accept program funds with mandates that restrict access to care and force a gag on clinicians, or to forfeit Title X funding altogether, leaving gaps in access to family planning care that the Title X program was first established to fill.  The former scenario will result in the invasion of the physician-patient relationship; the transmission of incomplete, misleading, and medically dangerous information to women; and the frustration of the right to make an informed, independent decision as to whether to terminate a pregnancy.  The latter scenario will reduce funding available to crucial family planning providers, thereby reducing critical healthcare services available to women and vulnerable populations.

151.    Implementation of the Rule will cause harm to women, men, including adolescents who currently benefit from Title X services.  These irreparable harms have been abundantly demonstrated throughout the administrative record.  Ultimately, the State will bear the cost of many of these serious harms.

### A.    Rule Harms the Patient-Provider Relationship

152.    The Rule will undermine confidence and trust needed for an effective provider-patient relationship among family planning providers who continue to accept Title X funding.

153.    According to the American Medical Association, truthful and open communication between physician and patient is essential for trust in the relationship and for respect for autonomy; withholding information without the patient's knowledge or consent is contrary to medical ethics.  Yet the Rule requires physicians to disregard their Code of Medical Ethics and to tailor their speech when providing a patient with requested medical information, including but not limited to referrals for time-sensitive healthcare.

154.    In addition, the Rule invites intrusive federal scrutiny into the subjective motivations of Title X providers by prohibiting any conversations between doctors or nurses and their patients that Defendants deem to be "promoting" or "supporting" access to abortion.

155.    These same concerns extend to registered nurses, physician assistants, and licensed vocational nurses.  The patient-provider relationship remains the foundational responsibility of healthcare providers.  For instance, the American Nurses Association Code of Ethics states that, "[t]he nurse's primary commitment is to the patient, whether an individual, family, group, community, or population."[6]  The Rule undermines that responsibility by inhibiting all healthcare providers from providing comprehensive medical information to patients seeking referrals.

156.    The Rule's prohibition on abortion referrals will shame and stigmatize patients who express a desire for abortion, making those patients less willing to return to that provider for later contraceptives and other health care needs, or causing patients to doubt whether or not abortion is a lawful service available to them at all.

157.    Limiting permission to provide options counseling only to doctors and nurses with graduate degrees will further impact provider-patient relationships.  Counseling regarding medical options is safely and effectively provided by professionals with a variety of credentials; Defendants cite no evidence to the contrary.  If a well-qualified and trained registered nurse with a baccalaureate degree, but no master's degree, is present in a family planning clinic, a patient in need would be turned away without receiving any nondirective pregnancy options counseling at all.

158.    Furthermore, the requirement that lists of local providers contain only providers that also offer "comprehensive primary care" will exclude many qualified abortion providers,

---

[6] American Nurses Association, Code of Ethics for Nurses (2015); *id.* ("[t]he nurse practices with compassion and respect for the inherent dignity, worth, and unique attributes of every person."); *see also*, *e.g.*, Cal. Code Regs. tit. 16, § 1443.5 (outlining the standards of competent performance for nurses as including "[a]ct[ing] as the client's advocate . . . by giving the client the opportunity to make informed decisions about healthcare before it is provided" and "[f]ormulat[ing] a care plan, in collaboration with the client").

1    including for example many Planned Parenthood clinics, leaving women with even less

2    information and fewer choices.

3          159.    In some areas, the only qualified abortion provider is a specialized facility that

4    does not provide prenatal care or primary care services.  Omitting these providers from reference

5    lists will leave Title X patients who wish to terminate their pregnancy unable to obtain any local

6    referral.

7          160.    The Rule's negative impact on provider-patient relationships will have other

8    serious consequences.  Some women will lack the necessary information and support to effectuate

9    their decisions about their reproductive healthcare condition and options.  Defendants' blithe

10   assertion that counseling and referrals about abortion services are not needed for women's health

11   because information is "widely available and easily accessible, including on the internet" belies

12   the importance of these services to women's health and healthcare.  84 Fed. Reg. at 7746.

13   Indeed, counseling and referrals about abortion help women to take control of their most

14   "intimate and personal choices . . . central to personal dignity and autonomy."  *Planned*

15   *Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 851 (1992) (plurality op.).

16         161.    Lack of reliable information from trusted providers will delay access to abortion

17   for some women, causing further harms.  Reductions in trust within the provider-patient

18   relationship will also reduce some patients' willingness to access services in the first place, or to

19   return for additional contraceptive care later on.

20         162.    The Rule will cause particular harm to relationships between Title X providers and

21   adolescent patients in need of family planning services.  New requirements that necessitate

22   intrusive questioning and unnecessary documentation will prevent Title X providers from offering

23   the highest quality medical care to these patients, and reduce their willingness to access needed

24   sexual education and contraceptive services in the first place.

25   **B.    Loss of Title X Funding Will Reduce Access to Family Planning Services**

26         163.    If implemented, the Rule will dramatically reduce the number of providers

27   participating in California's Title X program, impeding access to care for and disproportionately

28   harming individuals with limited incomes.

34

164.    Providers who choose not to accept the Rule's mandates to compromise their high clinical standards of care will face reductions in needed funding due to the loss of Title X grants. Loss of Title X grants will render former Title X providers unable to provide the same reach and quality of services to low-income and under-served populations

165.    While California's Family PACT program can cover fee-for-service contraceptive care for a majority of California's Title X patients, it does not cover all such patients (for example, non-state residents or those with incomes between 200 and 250% of the federal poverty level), nor does it pay for a number of crucial budget categories, such as outreach.

166.    Loss of Title X funding will have a disproportionate impact on the most vulnerable patients by reducing the funds available for services that connect hard-to-reach patients with healthcare.  For example, in 2017 Title X paid for outreach that connected 65,000 homeless women statewide to a broad range of contraceptive methods, STD screening and prevention, and other Title X-covered services.  Without Title X funds, women experiencing homelessness in California will be less able to access family planning.

167.    A number of clinics will respond to loss of Title X funding by reducing clinic hours, or by eliminating off-site or remote locations that currently provide services at times and places that are convenient to certain patients.  Title X programs serve primarily low-income individuals who have no easy alternative sources of care.

168.    Loss of Title X funds will undermine the long-term financial viability of some family planning clinics, especially in rural or under-served areas.  This poses a particular risk to low-income rural residents, such as those in the seven rural California counties in which a Title X-funded clinic is currently the only publicly funded clinic offering a full range of contraceptive methods.

169.    Because the Rule will cause the exit from the Title X program of many facilities that specialize in reproductive health, such as Planned Parenthood, the remaining clinics, which are already stretched thin, will be forced to serve even more Title X patients, increasing wait times and reducing accessibility of family planning services.

170. Title X sites exist in just over 2,000 counties nationwide. In approximately one third of those counties, there is no FQHC site providing contraceptive services, leaving women in those counties with no option for Title-X supported services. In almost half of those counties, the FQHC, if they remained in the Title X program, would have to double their contraceptive client caseloads in order to serve all of those currently served by other Title X sites.

171. In California's less populous regions, the Rule will create "contraceptive deserts" where women in need of Title X-funded contraceptive services will be unable to find a well-qualified provider within their county. If all qualified family planning providers that also provide abortion services in California were to exit the Title X program, then eighteen counties would be left without any Title X-funded health center.

172. In many U.S. states, women already must travel long distances in order to receive reproductive healthcare services. Traveling to a reproductive health clinic requires taking days off work, incurring lost income, transportation and/or lodging costs. The Rule will exacerbate those burdens.

173. Where clinics continue to accept Title X funds, the Rule will create additional new barriers to patients seeking appropriate reproductive healthcare. The Rule's new ban on referrals for abortions, in combination with the weakening of requirements to offer a wide-range of medically approved contraceptive methods, will result in Title X patients having to visit a greater number of providers in order to find and obtain the family planning methods that are appropriate for them.

174. Some areas in California lack comprehensive primary health service providers that provide abortions. For women in these areas, even if they clearly state to their Title X provider that they have decided to have an abortion, their doctor will not be able to include reasonably accessible abortion providers in the list of providers, creating further barriers for the patient. Californian women in rural parts of Northern California will have to travel more than five hours in order to visit a provider that qualifies for the list and offers abortion services. Women in the Central Valley, central coast, and southeastern regions of California will have to drive 2-4 hours in order to visit a provider that qualifies for the list and offers abortion services.

175.    All of these reductions in accessibility will cause patients to reduce utilization of family planning services and to reduce utilization of contraceptive methods that are the best personal or medical choice.  Patients' choice of a method of contraceptive is influenced by the accessibility of the medical provider, as well as their preferred method's onsite availability and cost.  If access to the full range of contraceptive methods become less available or convenient, then patients will make do with less effective contraceptive methods, or go without.

**C.    Delayed Access to Contraception and Abortion Harms Women**

176.    As women resort to less effective contraceptive methods, or go without contraceptives altogether, the result of the Rule will be an increase in unintended pregnancies. Some pregnant women who receive incomplete or misleading referral information will experience delays in accessing desired abortion services, or will be prevented altogether from accessing these services even if medically necessary for the women's health.

177.    More than half of all unintended pregnancies end in miscarriage or abortion.

178.    For pregnancies carried to term, intervals between pregnancies of less than 18 months are associated with poor obstetric outcomes and maternal health problems.

179.    In the context of women's health decisions, and in particular with respect to a woman's decision about whether to carry to full term or terminate a pregnancy, obtaining complete and honest health care information and access to a full range of services is important *and* urgent.  Terminating a pregnancy is a time-sensitive medical decision.  Any delay in obtaining information or obtaining the necessary medical services is harmful to the patient and results in increased potential for complications.  Delays in accessing proper care can push women into later, more complex procedures with increased chance of complications and poor health outcomes.

180.    The consequences of the Rule will be particularly severe in circumstances where an abortion may not qualify as an "emergency service" under the Rule's narrow definition, but nevertheless implicate a woman's health.  Pregnancy may exacerbate existing medical conditions, such as diabetes, sickle cell anemia, cancer, and AIDS.

181.    An increase in unwanted pregnancy will harm women's lives more broadly, because "[t]he ability of women to participate equally in the economic and social life of the Nation has been facilitated by their ability to control their reproductive lives." *Casey*, 505 U.S. at 856 (plurality op.).

**D.    The Rule Will Encourage and Support Poorer Quality Title X Service**

182.    The Rule will make the family planning services provided by Title X programs less effective, because they will permit and, in some respects, mandate the provision of services that do not meet accepted clinical standards.

183.    Just as the Rule will cause the flight of high quality family planning providers from the Title X program, it will encourage new, lower-quality Title X providers to apply for and obtain funding.

184.    A number of clinics that do not adhere to the Quality Family Planning Guidelines have expressed interest in obtaining Title X funds, if the Rule takes effect. So-called "crisis pregnancy centers" have unsuccessfully sought access to California Title X funding in the past, and are now more likely to qualify for Title X funding under the new Rule.

185.    The principal aim of these types of family planning service providers is not to provide high quality family planning services, but to discourage or prevent women from seeking abortions.

186.    Many lower-quality providers do not offer comprehensive contraception services. Staff at some lower-quality providers have been trained not to answer phone inquiries such as, "do you provide abortions?," or "can I get the birth control pill at your center?" During appointments, staff at these lower-quality providers strongly encourage pregnant women to continue their pregnancies, and attempt to delay women's decisions so that abortion becomes a less safe and accessible alternative.

187.    These lower-quality providers will undermine patient trust generally, place unnecessary barriers to women's access to reproductive healthcare services, including abortion.

188.    Lower-quality providers will also be less likely to provide other important health services currently offered by all of California's Title X providers, such as STD screening and preventive services.

**E.    Damage to California's Well-Established Title X Network**

189.    The Rule threatens California's concrete and proprietary interest in ensuring access to healthcare and maintaining a stable network of healthcare providers.

190.    Over the years, Essential Access Health has made substantial investments in training and supporting the existing Title X provider network.

191.    In fiscal year 2017 alone, Essential Access provided 1,011 hours of technical assistance to Title X clinics.  From 2015 to 2018, more than 7,500 staff members of Title X facilities in California attended Essential Access' trainings regarding high quality provision of family planning and STD prevention services, covering subjects as diverse as prevention of human trafficking and responding to the Zika outbreak.

192.    The Rule will undermine years of investments that have raised the overall level of clinical practice for California's Title X providers as a group.

193.    Likewise, California has invested a great deal of time and resources into a "no wrong door" approach to reproductive healthcare; the goal is that women experience a seamless system that connects them with needed healthcare regardless of their particular eligibility category or where or how they first seek healthcare.  The expectation that any Title X providers will provide high quality, comprehensive referrals to all needed reproductive healthcare is an integral part of that "no-wrong-door" approach.  The Rule and the resulting exit of many of California's well-established providers from Title X will undermine the effectiveness of this policy.

194.    This rule takes particular aim at one valuable safety-net health provider, Planned Parenthood.  Planned Parenthood affiliates provide healthcare to women including nondirective counseling on all pregnancy options, including termination of pregnancy.  As a result of this rule, Planned Parenthood affiliates will likely refuse to participate in the Title X program.

195.    In California, however, the types of Title X providers who are likely to exit the program as a result of the Rule are diverse and varied, and include many of comprehensive primary healthcare providers, whom Defendants claim will increase participation in Title X as a result of the Rule.

**F.    Harm to State Health and Well-Being**

196.    As described in paragraphs 61-64 above, California's existing Title X providers play an essential and important role in providing a number of other vital health services for low-income residents.  They provide screenings and treatment or referrals for infectious disease, and act as a trusted entry point for medical care generally.

197.    Reduced funding for outreach and reduced accessibility of services will have direct and indirect adverse effects on the health and well-being of Californians generally.

198.    Unintended pregnancies have a serious, negative public health impact on the State. They are associated with increases in maternal and child morbidity, including increased odds of preterm birth term, low birth weight, and the potentially life-long negative health outcomes of premature birth.

199.    Specifically, an increase in unintended pregnancies will result in more incidents of intervals between pregnancies of less than 18 months.  Shortened pregnancy intervals carry consequences for children, as they are associated with higher rates of premature birth, birth defects, low birth weight, and low mental and physical functioning in early childhood.

200.    For some patients, reduced access to Title X services will mean delays in the diagnosis and treatment of serious infectious diseases.  Delays in the diagnosis and treatment of infectious disease, in turn, cause negative consequences for California's entire population.  When communicable diseases spread, the effects are felt broadly, especially among individuals with compromised immune systems, such as newborns and persons with chronic illnesses.

201.    For example, syphilis is a highly preventable disease that infects infants born to mothers with untreated or insufficiently treated syphilis.  Congenital syphilis can cause miscarriages, prematurity, and low birth weights.  Infants born with syphilis are at high risk for serious complications, including blindness, deafness, severe anemia, deformed bones, brain and

40

nerve problems, meningitis, and death.  If fewer women are able to access Title X services, which include screening and prevention of sexually transmitted diseases like syphilis, then more children will experience these serious consequences.

**G.    Financial Harm to the State**

202.    Finally, if women experience delays in access to contraception and abortion, and all the harms concomitant to delays, the State of California will absorb much of the financial and administrative burden that results in both the short and long term.

203.    California funds a significant portion of the costs of medical procedures associated with unintended pregnancies and their aftermath.  According to the Guttmacher Institute, 64.3% of unplanned births in California were publicly funded, primarily by Medi-Cal.  In 2010, California spent $1.8 billion on unintended pregnancies, of which $689.3 million was paid for from state coffers.

204.    Furthermore, California and other states will bear the primary responsibility for the increased costs of treating health conditions, ranging from cervical cancer to sexually transmitted diseases, due to delays in diagnosis and treatment.  Additional costs for uninsured patients will be borne by hospitals that are required to provide uncompensated care for emergency services.

205.    In addition, California will have to bear increased costs due to the Rule's expansion of the definition of "low-income" to include women who have trouble affording contraception because their employer refuses to abide by the Affordable Care Act's mandate for contraceptive coverage.  This change to Title X eligibility criteria appears to be Defendants' attempt to compensate for their decision to weaken the Affordable Care Act's requirement that employers provide women with no-cost contraceptive coverage.  This new regulation is currently subject to an injunction. *See* n.1, *supra*.  These additional expenses are created by Defendants' illegal rule change.

206.    The State of California and its residents will therefore suffer irreparable injury if the Rule is not enjoined and declared unlawful.

**FIRST CAUSE OF ACTION**

**(Violation of APA; 5 U.S.C. § 706—Contrary to Law)**

41

207.   Paragraphs 1 through 206 are realleged and incorporated herein by reference.

208.   The APA requires courts to "hold unlawful and set aside" agency action that is "not in accordance with law."  5 U.S.C. § 706(2)(A).

209.   The Rule conflicts with Section 1554 of the Affordable Care Act, which forbids the HHS Secretary from promulgating "any regulation" that:

> creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care; (2) impedes timely access to health care services; (3) interferes with communications regarding a full range of treatment options between the patient and provider; (4) restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions; [or] (5) violates the principles of informed consent and the ethical standards of health care professionals.

42 U.S.C. § 18114.

210.   The Rule conflicts with the nondirective mandate in the Consolidated Appropriations Act of 2018, P.L. 115-41, div. H, tit. II, 132 Stat. 716 (2018), which provides that "all pregnancy counseling" in Title X family planning projects "shall be nondirective."  For example, the Rule that Title X projects may provide inaccurate or misleading referral lists for patients seeking abortions (but no other postconception services) and requiring that all pregnant women be referred for prenatal services (even if they have expressed a choice to seek an abortion) are inconsistent with the nondirective mandate.

211.   By promulgating this new Rule, Defendants have acted contrary to the Affordable Care Act and the 2018 Appropriations Act.  In doing so, Defendants have taken action in violation of the APA.  The Rule is therefore invalid.

**SECOND CAUSE OF ACTION**

**(Violation of APA; 5 U.S.C. § 706—Exceeded Statutory Authority)**

212.   Paragraphs 1 through 212 are realleged and incorporated herein by reference.

213.   The APA requires courts to "hold unlawful and set aside" agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

214.   The Rule exceeds Defendants' authority under the Title X statute, which requires that grants for Title X programs "shall offer a broad range of acceptable and effective family planning methods and services" and a "comprehensive program of family planning services."  42 U.S.C. §§ 300(a), 300a(a).  The Rule directs that fund recipients may not offer a comprehensive program of family planning services, directly contrary to law, and will result in Title X programs that offer a narrower range of effective methods and services.

215.   By promulgating this new Rule, Defendants have acted in excess of their statutory authority under Title X.  In doing so, Defendants have taken action in violation of the APA.  The Rule is therefore invalid.

### THIRD CAUSE OF ACTION

### (Violation of APA; 5 U.S.C. § 706—Arbitrary and Capricious)

217.   Paragraphs 1 through 215 are realleged and incorporated herein by reference.

218.   The APA requires courts to "hold unlawful and set aside" agency action that is "arbitrary" or "capricious."  5 U.S.C. § 706(2)(A).

219.   In issuing the Rule, Defendants ignored impacts of the Rule as a whole that were raised by California and others in public comments.  Defendants have offered an explanation for their decision that "runs counter to the evidence before the agency"; it is "so implausible that it could not be ascribed to a difference of view or the product of agency expertise."  *Motor Veh. Mfrs. Ass'n v. State Farm Ins.*, 463 U.S. 29, 43 (1983).  Indeed, Defendants ignored evidence that the impact of the Rule to undermine the very purpose of the Title X statute.

220.   By promulgating this new Rule, Defendants have acted arbitrarily and capriciously and have abused their discretion.  In doing so, Defendants have taken action in violation of the APA.  The Rule is therefore invalid.

### FOURTH CAUSE OF ACTION

### (Violation of the Fifth Amendment of the U.S. Constitution)

221.   Paragraphs 1 through 220 are realleged and incorporated herein by reference.

222.   The Due Process Clause of the Fifth Amendment prohibits the federal

1  government from denying equal protection of the laws.  *Bolling v. Sharpe*, 347 U.S. 497, 499

2  (1954).

3    223.   The Rule specifically targets and harms women.  In particular, the Rule and the

4  weakening of requirements for comprehensive, evidence-based reproductive healthcare adversely

5  targets and invidiously discriminates against women.

6    224.   The Rule targets individuals for discriminatory treatment based on pregnancy.

7  Pregnant individuals will not enjoy the same comprehensive, evidence-based healthcare

8  information as other individuals who are not pregnant.  Specifically, the Rule targets individuals

9  seeking abortion care, and denies them access to accurate and complete referral information.

10    225.   The Rule targets individuals for discriminatory treatment based on a gender

11  classification, and thereby discriminates based on sex.

12    226.   The Rule is not substantially related to an important government interest, let alone

13  rationally related to a legitimate government interest.  The reasons offered by Defendants in the

14  preamble of the Rule are unfounded and pretextual.

15    227.   Even if Defendants have an interest, the Rule is not tailored to achieve that

16  interest.  The Rule will impermissibly impose burdens on women.

17    228.   By promulgating the Rule, Defendants have violated the equal protection

18  guarantee of the Fifth Amendment of the U.S. Constitution.

19    229.   Defendants' violation causes ongoing harm to the States and their residents.

20  ## PRAYER FOR RELIEF

21    WHEREFORE, the State of California, by and through Attorney General Xavier Becerra,

22  respectfully requests that this Court:

23    1. Issue a declaratory judgment that the Rule is contrary to the law;

24    2. Issue a declaratory judgment that the Rule exceeds Defendants' statutory authority;

25    3. Issue a declaratory judgment that the Rule is arbitrary, capricious, and an abuse of

26  discretion, in violation of the Administrative Procedures Act;

27    4. Issue a declaratory judgment that the Rule violates the Equal Protection Clause;

28

1          5.  Postpone the effective date of the Rule, pending judicial review, pursuant to 5 U.S.C. §

2    705;

3          6.  Hold unlawful and set aside the Rule, pursuant to 5 U.S.C. § 706(2);

4          7.  Issue a preliminary injunction prohibiting implementation of the Rule;

5          8.  Issue a permanent injunction prohibiting implementation of the Rule;

6          9.  Award California costs, expenses, and reasonable attorneys' fees;

7          10.  Award such other relief as the Court deems just and proper.

8    Dated:  March 4, 2019                 Respectfully Submitted,
                                           XAVIER BECERRA
9                                          Attorney General of California
                                           MICHAEL L. NEWMAN
10                                         Senior Assistant Attorney General
                                           KATHLEEN BOERGERS
11                                         Supervising Deputy Attorney General

12                                         */s/ Anna Rich*
                                           ANNA RICH
13                                         BRENDA AYON VERDUZCO
                                           KARLI EISENBERG
14                                         Deputy Attorneys General
15                                         *Attorneys for Plaintiff State of California, by  and through*
                                           *Attorney General Xavier Becerra*
16    SA2018101519/71770475.docx

17

18

19

20

21

22

23

24

25

26

27

28