1   XAVIER BECERRA
    Attorney General of California
2   RENU. R. GEORGE
    Senior Assistant Attorney General
3   KATHLEEN BOERGERS
    Supervising Deputy Attorney General
4   ANNA RICH
    BRENDA AYON VERDUZCO
5   KETAKEE R. KANE, State Bar No. 291828
    Deputy Attorney General
6    1515 Clay Street, 20th Floor
     P.O. Box 70550
7    Oakland, CA 94612-0550
     Telephone: 510-879-1519
8    Fax: 510-622-2270
     E-mail: Ketakee.Kane@doj.ca.gov
9   *Attorneys for Plaintiff State of California, by and*
    *through Attorney General Xavier Becerra*

10

11                 IN THE UNITED STATES DISTRICT COURT

                   FOR THE NORTHERN DISTRICT OF CALIFORNIA
12

13

14

| | |
|---|---|
| 15  **STATE OF CALIFORNIA, by and through ATTORNEY GENERAL XAVIER BECERRA,** | 3:19-cv-01184-EMC |
| 16 | |
| 17                                                   Plaintiff, | **NOTICE OF PETITION FOR WRIT OF CERTIORARI** |
| 18                     **v.** | |
| 19 | Judge:           Honorable Edward M. Chen |
| 20  **ALEX AZAR, in his OFFICIAL CAPACITY as SECRETARY of the U.S.** | Trial Date:     None set. |
| 21  **DEPARTMENT of HEALTH & HUMAN SERVICES; U.S. DEPARTMENT of HEALTH & HUMAN SERVICES,** | Action Filed:  March 4, 2019 |
| 22 | |
| 23                                                 Defendants. | |

24

25

26

27

28

---

1    Plaintiff State of California, by and through Attorney General Xavier Becerra (California),

2  writes to bring the Court's attention to California's Petition to the Supreme Court of the United

3  States of America for a Writ of Certiorari.

4    On April 26, 2019, this Court granted California's motion for a preliminary injunction

5  enjoining the U.S. Department of Health & Human Services' new regulations implementing the

6  Title X program (84 Fed. Reg. 7714 (2019)). *See California v. Azar*, 385 F. Supp. 3d 960 (N.D.

7  Cal. 2019). On February 24, 2020, the Ninth Circuit Court of Appeals reversed the grant of

8  preliminary injunction. *California v. Azar*, 950 F.3d 1067 (9th Cir. 2020) (*en banc*).

9    On October 6, 2020, California filed a petition for a writ of certiorari seeking review of the

10  Ninth Circuit decision. A copy of the petition is attached as Exhibit A to this notice.

11

12  Dated: October 7, 2020                   Respectfully Submitted,

13                                            XAVIER BECERRA
                                             Attorney General of California
14                                            RENU R. GEORGE
                                             Senior Assistant Attorney General
15                                            KATHLEEN BOERGERS
                                             Supervising Deputy Attorney General

16                                            */s/ Ketakee Kane*
                                             KETAKEE KANE
17                                            Deputy Attorney General
                                             *Attorneys for Plaintiff State of California, by*
18                                            *and through Attorney General Xavier*
                                             *Becerra*
19
    OK2019600558
20

21

22

23

24

25

26

27

28

1

# Exhibit A

No. __-____

IN THE

## Supreme Court of the United States

OREGON, et al.,

*Petitioners,*

v.

ALEX M. AZAR II, et al.,

*Respondents.*

CALIFORNIA,

*Petitioner,*

v.

ALEX M. AZAR II, Secretary,
U.S. Department of Health & Human Services, et al.,

*Respondents.*

ON PETITION FOR A WRIT OF CERTIORARI TO
THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

PETITION FOR A WRIT OF CERTIORARI FOR THE STATES
OF OREGON, NEW YORK, CALIFORNIA, COLORADO,
CONNECTICUT, DELAWARE, DELAWARE, HAWAI'I, ILLINOIS,
MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA,
NEVADA, NEW JERSEY, NEW MEXICO, NORTH CAROLINA,
PENNSYLVANIA, RHODE ISLAND, VERMONT, VIRGINIA,
AND WISCONSIN, AND THE DISTRICT OF COLUMBIA

ELLEN F. ROSENBLUM
*Attorney General of Oregon*
BENJAMIN GUTMAN
*Solicitor General*
 1162 Court Street N.E.
 Salem, OR 97301

XAVIER BECERRA
*Attorney General of California*
 1300 I Street
 Sacramento, CA 95814

LETITIA JAMES
*Attorney General of New York*
BARBARA D. UNDERWOOD*
*Solicitor General*
ANISHA S. DASGUPTA
*Deputy Solicitor General*
JUDITH N. VALE
*Senior Assistant Solicitor General*
LAURA ETLINGER
*Assistant Solicitor General*
 28 Liberty Street
 New York, NY 10005
 (212) 416-8020
 barbara.underwood@ag.ny.gov
 *Counsel of Record*

*(Counsel list continues on signature pages.)*

*i*

## QUESTIONS PRESENTED

For fifty years, the federal government has funded family-planning and reproductive healthcare services for low-income and underserved patients through Title X of the Public Health Services Act, codified at 42 U.S.C. § 300 et seq.  In 2019, the Department of Health and Human Services (HHS) promulgated a rule that, among other things, prohibits Title X providers from communicating certain abortion-related information to their patients, and requires physical separation of Title X-funded care from healthcare facilities that provide abortion services or certain abortion-related information.

The questions presented are:

1. Does the Final Rule violate appropriations statutes requiring that "all pregnancy counseling" in the Title X program "shall be nondirective"?

2. Does the Final Rule violate § 1554 of the Affordable Care Act (ACA), which prohibits HHS from promulgating "any regulation" that creates "unreasonable barriers" to obtaining appropriate medical care; impedes "timely access" to such care; interferes with patient-provider communications "regarding a full range of treatment options"; restricts providers from disclosing "all relevant information to patients making health care decisions"; or violates providers' ethical standards?

3. Is the Final Rule arbitrary and capricious, in violation of the Administrative Procedure Act, including by failing to respond adequately to concerns that (a) the rule requires medical professionals to

*ii*

violate medical ethics and (b) the counseling restric-
tions and physical-separation requirement impose
significant costs and impair access to care?

*iii*

## PARTIES TO THE PROCEEDING

Petitioners, who were plaintiffs in proceedings in two different courts below, consolidated for review in the Court of Appeals, are:

- Oregon, New York, Colorado, Connecticut, Delaware, the District of Columbia, Hawaiʻi, Illinois, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, North Carolina, Pennsylvania, Rhode Island, Vermont, Virginia, and Wisconsin, all of which were plaintiffs in the proceeding below in the District of Oregon and appellees in the court of appeals; and

- California, by and through Attorney General Xavier Becerra, which was a plaintiff in the proceeding below in the Northern District of California and appellee in the court of appeals.

Respondents are Alex M. Azar II, in his official capacity as the Secretary of Health and Human Services; the U.S. Department of Health & Human Services; Diane Foley, M.D., in her official capacity as the Deputy Assistant Secretary, Office of Population Affairs; and the Office of Population Affairs. Azar and the Department of Health & Human Services were defendants in both of the proceedings below, and Foley and the Office of Population Affairs were defendants in the Oregon proceeding. All respondents were appellants in the court of appeals.

The American Medical Association, Oregon Medical Association, Planned Parenthood Federation of America, Inc., Planned Parenthood of Southwestern Oregon, Planned Parenthood Columbia Willamette, Thomas N. Ewing, M.D., and Michele P. Megregian,

iv

C.N.M. were also plaintiffs in the proceeding below in the District of Oregon and appellees in the court of appeals. They are separately represented and are not petitioners on this petition.

Essential Access Health and Dr. Melissa Marshall, M.D. were also plaintiffs in the proceeding below in the Northern District of California and appellees in the court of appeals. They are separately represented and are not petitioners on this petition.

The State of Washington, National Family Planning & Reproductive Health Association, Feminist Women's Health Center, Deborah Oyer, M.D., and Teresa Gall were plaintiffs in proceedings in the Eastern District of Washington and appellees in the court of appeals. They are separately represented and are not petitioners on this petition.

*v*

## RELATED PROCEEDINGS

There are two directly related proceedings within the meaning of this Court's Rule 14.1(b)(iii):

1. *Oregon v. Azar*, D. Or. Nos. 19-cv-317, 19-cv-318. The district court entered a preliminary injunction on April 29, 2019, which was vacated by the en banc Ninth Circuit decision challenged in this petition.

2. *California v. Azar*, N.D. Cal. Nos. 19-cv-1184, 19-cv-1195. The district court entered a preliminary injunction on April 26, 2019, which was vacated by the en banc Ninth Circuit decision challenged in this petition.

The Final Rule was also challenged in three other district courts:

1. *Washington v. Azar*, E.D. Wash. Nos. 19-cv-3040, 19-cv-3045. The district court entered a preliminary injunction on April 25, 2019, which was vacated by the en banc Ninth Circuit decision challenged in this petition.

2. *Mayor & City Council of Baltimore v. Azar*, D. Md. No. 19-cv-1103. The district court issued a preliminary injunction on May 30, 2019, and a permanent injunction on February 14, 2020. The permanent injunction was affirmed by the en banc Fourth Circuit on September 3, 2020 (Nos. 19-1614, 20-1215).

3. *Family Planning Ass'n of Maine v. Azar*, D. Me. No. 19-cv-100. The district court denied the plaintiffs' motion for a preliminary injunction on July 3, 2019, and then denied the plaintiffs' motion for summary judgment and dismissed the complaint on June 9, 2020. The plaintiffs filed a notice of appeal to the First

*vi*

Circuit on August 7, 2020 (No. 20-1781); briefing has
not yet begun and no argument is scheduled.

*vii*

## TABLE OF CONTENTS

**Page**

Table of Authorities .................................................. viii

Opinions Below .......................................................... 1

Jurisdiction ................................................................ 1

Statutory and Regulatory Provisions Involved .......... 1

Introduction ............................................................... 2

Statement .................................................................. 5

    A.  Statutory and Regulatory Background .......... 5

    B.  Procedural Background ................................ 11

    C.  The Ninth Circuit's En Banc Decision
        Below .......................................................... 14

Reasons to Grant the Petition ................................... 16

    A.  There Is a Square Circuit Split on the
        Questions Presented Here ............................. 16

    B.  The Ninth Circuit's Decision Is Wrong ......... 20

    C.  The Cases Decided by the Ninth Circuit
        Present the Best Vehicle for Deciding
        the Challenges to the Final Rule. ................. 25

Conclusion ................................................................ 32

*viii*

# TABLE OF AUTHORITIES

**Cases**                                    **Page(s)**

*Mayor of Baltimore v. Azar*, 392 F. Supp. 3d
   602 (D. Md. 2019) ...................................................5

*Mayor of Baltimore v. Azar*, Nos. 19-1614, 20-
   1215, __ F.3d __, 2020 WL 5240442 (4th
   Cir. Sept. 3, 2020)......................................... passim

*Michigan v. EPA*, 576 U.S. 743 (2015) .....................23

*Motor Vehicle Mfrs. Ass'n of United States, Inc.
   v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.
   29 (1983) .................................................................23

*National Family Planning & Reproductive
   Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227
   (D.C. Cir. 1992) ...................................................7,8

*Rust v. Sullivan*, 500 U.S. 173 (1991)............7,8,24,25

**Laws**

Pub L. No. 104-134, 110 Stat. 1321-221 (1996)..........8

Pub. L. No. 116-94, 133 Stat. 2534 (2019).............1,20

5 U.S.C. § 706 ........................................................1,12

42 U.S.C.
   § 254c-6 .................................................................21
   § 300 et seq. .............................................................2
   § 300a-6.................................................................1,6
   § 18114.........................................................1,10,22

**Regulations & Rulemaking**

42 C.F.R.
   § 59.14.............................................................11,20
   § 59.15................................................................11

45 C.F.R. § 75.501......................................................6

*ix*

| Regulations & Rulemaking | Page(s) |
|---|---|
| 53 Fed. Reg. 2,922 (Feb. 2, 1988) | 7 |
| 58 Fed. Reg. 7,462 (Feb. 5, 1993) | 8 |
| 58 Fed. Reg. 7,464 (Feb. 5, 1993) | 8 |
| 65 Fed. Reg. 41,270 (July 3, 2000) | 6,9,10 |
| 84 Fed. Reg. 7,714 (Mar. 4, 2019) | 10,11,20,21 |

Comment Letter from Attorneys General of California, Connecticut, Delaware, Hawaiʻi, Illinois, Iowa, Maine, Maryland, Minnesota, New Jersey, New Mexico, North Carolina, and the District of Columbia (July 30, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-161828 ... 28

Comment Letter from Attorneys General of Washington, Massachusetts, Oregon, and Vermont (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-182278 ... 27,28

Comment Letter from Guttmacher Institute (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-177880 ... 26

Comment Letter from National Family Planning & Reproductive Health Association (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-192227 ... 27

Comment Letter from Planned Parenthood Federation of America & Planned Parenthood Action Fund (July 31, 2018) ... 27

Comment Letter from State of Hawaiʻi (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-189799 ... 28

*x*

**Regulations & Rulemaking**                **Page(s)**

Comment Letter from State of New York (July
    30, 2018), https://www.regulations.gov/
    document?D=HHS-OS-2018-0008-155772 .......... 28

**Miscellaneous Authorities**

*Congressional Materials*

137 Cong. Rec. (1991)
    18,435 ................................................................ 9
    18,491 ................................................................ 9

141 Cong. Rec. (1995)
    21,634 ................................................................ 9
    21,637 ................................................................ 9

H.R. 2707, 102d Cong. (1992) ..................................... 8

H.R. Rep. No. 102-204 (1991) ..................................... 9

S. 323, 102d Cong. (1992) ............................................ 8

*Title X Regulations (The Gag Rule): Health
    Implications for Poor Women, Hr'g of the S.
    Comm. on Labor & Human Resources*, 102d
    Cong. (1991) .......................................................... 9

*Other*

Am. Acad. of Pediatrics, Comm. on Adolescence,
    *Options Counseling for the Pregnant
    Adolescent Patient*, 140 Pediatrics 1 (Sept.
    2017), https://pediatrics.aappublications.org/
    content/pediatrics/140/3/e20172274.full.pdf ...... 6,7

Am. Coll. of Obstetricians & Gynecologists,
    Code of Professional Ethics, 102 Obstetrics
    & Gynecology 663 (Sept. 2003) ............................. 6

Am. Coll. of Obstetricians & Gynecologists,
    *Guidelines for Women's Health Care: A
    Resource Manual* (4th ed. 2014) ........................... 6

*xi*

**Miscellaneous Authorities**                    **Page(s)**

Ariana Eunjung Cha, *New Federally Funded
    Clinics Emphasize Abstinence, Natural
    Family Planning*, Wash. Post (July 29, 2019),
    https://www.washingtonpost.com/health/2019/
    07/22/new-federally-funded-clinics-california-
    emphasize-abstinence-natural-family-
    planning/ ................................................ 31

Essential Access Health, California's Statewide
    Title X Network Coverage Map 2018 vs. 2020
    (Apr. 2020), https://www.essentialaccess.org/
    sites/default/files/essential-access-california-
    title-x-network-comparison-sept-2020.pdf .......... 31

Kaiser Family Found., *The Status of
    Participation in the Title X Federal Family
    Planning Program* (Dec. 20, 2019),
    https://www.kff.org/interactive/the-status-of-
    participation-in-the-title-x-federal-family-
    planning-program/ ......................................... 30-31

Kinsey Hasstedt, *Federally Qualified Health
    Centers: Vital Sources of Care, No Substitute
    for the Family Planning Safety Net*, 20
    Guttmacher Pol'y Rev. 68 (2017),
    https://www.guttmacher.org/sites/default/file
    s/article_files/gpr2006717_0.pdf .......................... 31

Loretta Gavin, et al., *Providing Quality Family
    Planning Services: Recommendations of CDC
    and the U.S. Office of Population Affairs*, 63
    Morbidity & Mortality Weekly Report:
    Recommendations & Reports 14 (Apr. 25,
    2014), https://www.cdc.gov/mmwr/pdf/
    rr/rr6304.pdf .......................................................... 6

*xii*

| Miscellaneous Authorities | Page(s) |
|---|---|

Office of Family Planning, U.S. Dep't of Health &
Human Servs., Program Guidelines for
Project Grants for Family Planning Services
(1981) ...................................................................... 7

Office of Population Affairs, U.S. Dep't of Health
& Human Servs., *Title X Family Planning
Annual Report: 2019 National Summary*
(Sept. 2020),
https://opa.hhs.gov/sites/default/files/2020-
09/title-x-fpar-2019-national-summary.pdf ........ 32

Office of Population Affairs, U.S. Dep't of Health
& Human Servs., Title X Family Planning
Directory (Dec. 2018),
https://opa.hhs.gov/sites/default/files/2020-
07/Title-X-Family-Planning-Directory-
December2018.pdf................................................. 31

Office of Population Affairs, U.S. Dep't of Health
& Human Servs., Title X Family Planning
Directory (Aug. 2020),
https://opa.hhs.gov/sites/default/files/2020-
09/title-x-family-planning-directory-
august2020.pdf................................................. 30,31

Ruth Dawson, *Trump Administration's Domestic
Gag Rule Has Slashed the Title X Network's
Capacity by Half* (Guttmacher Inst. Feb. 26,
2020), https://www.guttmacher.org/article/2020/
02/trump-administrations-domestic-gag-rule-
has-slashed-title-x-networks-capacity-half ......... 30

## OPINIONS BELOW

The en banc court of appeals' opinion, AMA Pet. App. 1a–94a,[1] is reported at 950 F.3d 1067. A prior panel order on respondents' motion for stay pending appeal, AMA Pet. App. 271a–289a, is reported at 927 F.3d 1068. The opinions of the district courts, AMA Pet. App. 95a–134a, 159a–269a, are reported at 389 F. Supp. 3d 898, and 385 F. Supp. 3d 960.

## JURISDICTION

The court of appeals entered judgment on February 24, 2020. A timely petition for rehearing was denied on May 8, 2020. By order dated March 19, 2020, this Court extended the deadline to file any petition for a writ of certiorari to 150 days from, as relevant here, an order denying a timely petition for rehearing. This Court's jurisdiction rests on 28 U.S.C. § 1254(1).

## STATUTORY AND REGULATORY PROVISIONS INVOLVED

The statutory provisions involved are 5 U.S.C. § 706, 42 U.S.C. § 300a-6, 42 U.S.C. § 18114, and Pub. L. No. 116-94, 133 Stat. 2534 (2019). They are reproduced in the appendix to the petition filed in *American Medical Association v. Azar*, No. 20-429.

---

[1] References are to the Appendix filed by the other Ninth Circuit petitioners in *American Medical Association v. Azar,* No. 20-429.

2

# INTRODUCTION

At issue is the validity of an HHS Final Rule that undermines the stability of the Title X program, 42 U.S.C. § 300 et seq., which funds reproductive healthcare for underserved patients. The questions presented here are the subject of conflicting decisions from two courts of appeals, each sitting en banc. In the decision below, an en banc panel of the Ninth Circuit upheld the Final Rule, rejecting claims that the Rule violates the law and is arbitrary and capricious. AMA Pet. App. 68a. In parallel litigation raising the same issues that petitioners raise here, the en banc Fourth Circuit held that the Rule was invalid. *See Mayor of Baltimore v. Azar*, Nos. 19-1614, 20-1215, __ F.3d __, 2020 WL 5240442, at *1 (4th Cir. Sept. 3, 2020) (en banc). This petition—brought by a broad coalition of States that have a full range of roles within the Title X program—presents the best vehicle for resolving the circuit split should the Court decide to do so.

For fifty years, Title X has funded grants to States and other entities to provide family-planning services and reproductive healthcare to patients who have low incomes, live in rural communities, or face other barriers to accessing medical care. Title X allows those patients to receive contraception, testing and treatment for sexually transmitted infections, breast and cervical cancer screening, and pregnancy testing and counseling. Title X does not fund abortions. Instead, by providing timely access to contraception and counseling, Title X projects have substantially reduced the number of unintended pregnancies and abortions nationwide, including in the petitioner States.

Although Title X does not fund post-conception healthcare, one of the crucial services that it funds is

3

pregnancy counseling for patients who learn that they are pregnant. Counseling ensures that those patients understand how to obtain the healthcare and other services they want—whether prenatal care, adoption resources, or abortion—from providers outside the Title X program.

In a break with decades of consistent practice under Title X, the Final Rule restricts what doctors and other providers can tell a patient during pregnancy counseling. Those restrictions contravene two congressional enactments: the Nondirective Mandate, an annual appropriations rider requiring that all pregnancy counseling offered through Title X provide neutral and complete information without steering the patient towards any particular option; and the Noninterference Mandate (enacted as § 1554 of the ACA), which, among other things, broadly prohibits HHS from promulgating any regulation that interferes with provider-patient communications about the full range of treatment options. The Final Rule allows —and in some instances requires—Title X grantees to give pregnant patients directive counseling. And it prevents grantees from providing factual, neutral information to patients about the full range of options, which forces healthcare providers to violate their ethical obligations to their patients.

The Final Rule also requires grantees to physically separate their Title X facilities from facilities that provide any abortion-related services, including referrals for abortion. HHS imposed those cost-prohibitive requirements and the counseling restrictions without considering how they will shrink the availability of Title X services.

4

Petitioners are a group of twenty-one States and the District of Columbia, some of whom are direct Title X grantees and all of whom work to protect public health within their jurisdictions. Petitioners warned HHS that the Final Rule's illegal and arbitrary changes to Title X would have devastating impacts on patients and public health. They noted that if the Final Rule were adopted, substantial numbers of Title X providers would be forced to leave the program—reducing the availability of critical family planning and reproductive health services for underserved patients. The result would be more unintended pregnancies, riskier pregnancies, more abortions, more sexually transmitted infections, and worse health outcomes.

As a result of the court of appeals' ruling here, the Final Rule is now in effect in forty-nine States and the District of Columbia, and the consequences for the Title X program that the States warned about have come to pass. About a quarter of the 4,000 previous Title X sites are no longer participating in the program. In the petitioner States of Hawaiʻi, Oregon, and Vermont, 100 percent of the Title X providers have withdrawn from the program. In the petitioner States of New York, Connecticut, and Illinois at least 90 percent of Title X providers withdrew. And in the petitioner States of California, Massachusetts, Michigan, Minnesota, and New Jersey, the Title X provider networks were reduced by 50 to 89 percent. As of August 2020, only six new grantees had joined the Title X program. The result has been a precipitous decline in the availability of Title X services in the petitioner States.

The breadth of the coalition of States and the range of roles they play within the Title X system

5

make this petition an optimal vehicle for addressing the split between the Fourth and Ninth Circuits. Accordingly, if the Court decides to review the questions presented here, it should grant this petition and the parallel one filed by the other Ninth Circuit parties instead of, or at least in addition to, any petition that may arise out of the Fourth Circuit proceedings.

## STATEMENT

### A.  Statutory and Regulatory Background

1. Enacted in 1970 with broad bipartisan support, the Title X program has funded grants to States and other entities to provide family-planning services, reproductive healthcare, and preventive care largely for patients who have low incomes, live in rural communities, or face other barriers to accessing medical care. Title X services are available at no cost or on a sliding scale depending on ability to pay. The family planning services provided by Title X have substantially reduced the number of unintended pregnancies and abortions in the petitioner States. *See* AMA Pet. App. 100a, 187a; *Mayor of Baltimore v. Azar*, 392 F. Supp. 3d 602, 611, n 8 (D. Md. 2019). The vaccinations, tests for sexually transmitted infections, and cancer screenings that Title X enables significantly enhance patient health and overall public health in our communities. *See* AMA Pet. App. 69a (Paez, J., dissenting); AMA Pet. App. 99a–100a, 182a; *Mayor of Baltimore*, 2020 WL 5240442, at *8 n.6. Title X programs do not provide pregnancy care, but they do provide counseling to pregnant patients, including referrals to other medical providers.

6

Section 1008 of Title X precludes grants from being "used in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6. Grantees are subject to audit and compliance programs to ensure that Title X funds are used only for Title X activities. AMA Pet. App. 87a (Paez, J., dissenting); *see also* 45 C.F.R. § 75.501 (requiring regular audits of entities that expend $750,000 in HHS awards in a fiscal year).

For nearly fifty years, HHS has recognized that § 1008 allows Title X projects to provide the nondirective pregnancy counseling required by established standards of medical care and medical ethics. *See* Standards of Compliance for Abortion-Related Services in Family Planning Services Projects, 65 Fed. Reg. 41,270, 41,273–74 (July 3, 2000). Loretta Gavin, et al., *Providing Quality Family Planning Services: Recommendations of CDC and the U.S. Office of Population Affairs*, 63 Morbidity & Mortality Weekly Report: Recommendations & Reports 14 (Apr. 25, 2014) (internet).[2] These standards require the opportunity to receive information about prenatal care and delivery, adoption, and abortion in a neutral manner that does not steer a patient toward a particular option.[3] The information provided during nondirective counseling includes both "an unbiased discussion" of

---

[2] For authorities available on the internet, URLs appear in the table of authorities. All websites last visited October 4, 2020.

[3] *See* Am. Acad. of Pediatrics, Comm. on Adolescence, *Options Counseling for the Pregnant Adolescent Patient*, 140 Pediatrics 1, 2–3 (Sept. 2017) (internet); Am. Coll. of Obstetricians & Gynecologists, *Guidelines for Women's Health Care: A Resource Manual* 719–20 (4th ed. 2014); *see also* Am. Coll. of Obstetricians & Gynecologists, Code of Professional Ethics, 102 Obstetrics & Gynecology 663, 664–65 (Sept. 2003).

7

any pregnancy options the patient is considering and referrals "to appropriate resources and services."[4]

In 1981, HHS issued written guidelines requiring all Title X grantees to offer nondirective counseling, including referrals, to pregnant patients. Office of Family Planning, U.S. Dep't of Health & Human Servs., Program Guidelines for Project Grants for Family Planning Services 13 (1981) ("1981 Guidelines"). As HHS explained at that time, nondirective counseling comports with § 1008 because factual discussion of all pregnancy options does not fund abortions or promote abortion as a method of family planning. *See National Family Planning & Reproductive Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 229 (D.C. Cir. 1992).

In 1988, HHS reversed course and prohibited Title X projects from providing any counseling about abortion, including referrals. Statutory Prohibition on Use of Appropriated Funds in Programs Where Abortion is a Method of Family Planning, 53 Fed. Reg. 2,922, 2,945 (1988). The 1988 regulations further required that Title X programs be, to some extent, physically separated from abortion services, purportedly to avoid confusion among Title X grantees about how to comply with § 1008. *Id.* at 2,923–24.

This Court upheld the 1988 regulations in *Rust v. Sullivan*, concluding that § 1008 was ambiguous because at that time, Congress had not spoken "directly to the issues of counseling, referral, advocacy, or program integrity." 500 U.S. 173, 184 (1991). The Court also concluded that the regulations were sufficiently supported by the administrative record

---

[4] Am. Acad. of Pediatrics, *supra*, at 1.

8

that HHS proffered in support of the 1988 regulation. *Id.* at 187–89. The regulations never went fully into effect because HHS changed its policy amid ongoing litigation. *See National Family Planning*, 979 F.2d at 241.

In 1993, HHS revoked the 1988 regulations, reinstated the 1981 Guidelines, and removed the physical-separation requirements. Standards of Compliance for Abortion-Related Services in Family Planning Service Projects, 58 Fed. Reg. 7,464 (Feb. 5, 1993); *see also* Standards of Compliance for Abortion-Related Services in Family Planning Service Projects 58 Fed. Reg. 7,462 (Feb. 5, 1993).

2. Starting in 1996, Congress enacted appropriations statutes every year requiring that "all pregnancy counseling" in Title X programs "shall be nondirective" (the Nondirective Mandate). *See, e.g.*, Department of Health and Human Services Appropriations Act, 1996, Pub L. No. 104-134, 110 Stat. 1321-221. The legislative history and context of the Nondirective Mandate make clear that Congress understood nondirective pregnancy counseling to have the meaning set forth in prevailing medical standards of care and adopted by the 1981 Guidelines—i.e., the unbiased provision of information, including referrals, about all pregnancy options. See *supra*, at 6–7.

After *Rust*, Congress twice passed legislation—ultimately vetoed—clarifying that § 1008 required nondirective counseling, including referrals, about all legal pregnancy options. *See* H.R. 2707, § 514, 102d Cong. (1992) (reported in Senate); S. 323, 102d Cong. (1992). As both supporters and opponents of these and similar bills explained, nondirective counseling means providing factual information about all pregnancy

9

options without steering a patient to "one option over another." 137 Cong. Rec. 18,435 (1991) (Senator Chafee, sponsor of S. 323); *id.* at 18,491 (Senator Hatch, who opposed S. 323, explaining that "truly nondirective" counseling would not "counsel for one option over another"). And as legislators and advocates further explained, nondirective counseling includes referrals— as the 1981 Guidelines had previously required. *See, e.g.*, H.R. Rep. No. 102-204 (1991) (1981 Guidelines "enumerated such [nondirective] options counseling to include information and referral"); *Title X Regulations (The Gag Rule): Health Implications for Poor Women, Hr'g of the S. Comm. on Labor & Human Resources*, 102d Cong. 34 (1991) (statement of Lee Minto, Planned Parenthood of Seattle-King County) (nondirective counseling ensures that a patient "receives accurate information" and "gets appropriate referrals").

Congress applied this same understanding of nondirective pregnancy counseling when it enacted the Nondirective Mandate. Congress enacted the Mandate to preserve then-current "law and policy with respect to Title X recipients and abortion funding, counseling, and lobbying," 141 Cong. Rec. 21,637 (1995). The appropriations statute reiterated § 1008's requirement that Title X funds "shall not be expended for abortions." *Id.* at 21,634. And consistent with the 1981 Guidelines—which were then back in place—the appropriations statute made "clear that all counseling must be nondirective"; i.e., all counseling must "lay out the legal options" available to pregnant patients. *Id.* (statement of House sponsor)

In 2000, HHS promulgated regulations implementing the Nondirective Mandate and formally adopting the nondirective counseling rules set forth in the 1981 Guidelines. 65 Fed. Reg. at 41,270–71. The 2000

10

regulations also provided that while grantees must financially separate their Title X programs from abortion-related services funded by non–Title X funds, physical separation is not required. *Id.* at 41,275–76. HHS explained in regulatory documents accompanying the 2000 regulations that even without a physical-separation requirement, Title X grantees had been successfully using Title X funds strictly for authorized purposes "for virtually the entire history" of Title X. *Id.* at 41,272, 41,275.

3. In 2010, Congress enacted § 1554 of the ACA, 42 U.S.C. § 18114, to further protect patients' ability to receive medical information and services that are ethically and medically appropriate. Section 1554's Noninterference Mandate broadly prohibits HHS from promulgating "any regulation" that creates "unreasonable barriers" to obtaining appropriate medical care, impedes "timely access" to such care, interferes with patient-provider communications "regarding a full range of treatment options," restricts providers from disclosing "all relevant information to patients making health care decisions," or violates providers' ethical standards. *Id.*

4. In March 2019, HHS published the Final Rule at issue here. Despite the Nondirective Mandate, the Final Rule *requires* that any pregnancy counseling must be directive in two respects: It requires any counseling about abortion to include counseling about carrying the pregnancy to term, regardless of the patient's expressed wishes, Compliance with Statutory Program Integrity Requirements, 84 Fed. Reg. 7,714, 7,724, 7,747 (Mar. 4, 2019); and it requires providers to refer every pregnant patient for prenatal care, and prohibits providers from giving any referrals for abortion—regardless of what the patient wants,

11

42 C.F.R. § 59.14; 84 Fed. Reg. at 7,744–48. The Rule also *allows* Title X grantees to discuss the options of prenatal care and adoption while omitting any information about abortion. 84 Fed. Reg. at 7,733, 7,744–46.

The Final Rule further requires Title X-funded care to be physically separated from activities prohibited by the Final Rule, including referrals for abortion: i.e., separate entrances and exits, separate personnel and workstations, and separate healthcare records. 42 C.F.R. § 59.15; 84 Fed. Reg. at 7,766–67.

### B.  Procedural Background

1. Immediately after HHS adopted the Final Rule, petitioners here—twenty-one States and the District of Columbia—challenged the Final Rule in two separate lawsuits. Oregon, New York, eighteen other States, and the District of Columbia filed a lawsuit in the U.S. District Court for the District of Oregon that was consolidated with a case brought by a group of individual medical providers and organizations of medical providers, including the American Medical Association and Planned Parenthood Federation of America, Inc. California filed a lawsuit in the U.S. District Court for the Northern District of California that was heard alongside a case brought by the Title X grantee in California, Essential Access Health, Inc., and a family medicine physician.

Together, the state and private petitioners in these lawsuits represent a wide array of Title X grantees, medical providers, and public health officials across the country, who served well over 1.6 million Title X patients annually. AMA Pet. App. 89a (Paez, J., dissenting). Each lawsuit alleged that the

12

Final Rule violates the Administrative Procedure Act (APA), 5 U.S.C. § 706(2), because it is contrary to the Nondirective Mandate, contrary to § 1554's Noninterference Mandate, and arbitrary and capricious.

2. Both of the district courts preliminarily enjoined the Final Rule's implementation. AMA Pet. App. 133a, 269a. Although each court issued its own ruling, the fundamental reasoning underlying both decisions was the same.

First, both courts determined that petitioners were likely to succeed on the merits of their APA claims. The courts concluded that the Final Rule likely contravenes Congress's Nondirective Mandate by mandating referrals for prenatal care while prohibiting referrals for abortion. AMA Pet. App. 112a–119a, 195a–208a. The courts also determined that the physical-separation requirements likely violate the Noninterference Mandate in § 1554 by, for example, interfering with communications between patients and medical providers, and creating unreasonable barriers to healthcare. AMA Pet. App. 120a–123a, 208a–224a.

The district courts also concluded that petitioners were likely to establish that the Final Rule was arbitrary and capricious. The courts explained that the Rule requires Title X providers to violate established standards of medical care and ethics, and that HHS's contrary assertions lacked any evidentiary support or rational explanation. The courts further explained that HHS had arbitrarily failed to consider the enormous costs and public-health harms that will result from the Final Rule, including harms to low-income women who already face barriers to obtaining care. AMA Pet. App. 123a–130a, 224a–263a.

13

Second, both district courts found that petitioner States, their residents, and the public health will be irreparably harmed by the Rule absent a preliminary injunction. AMA Pet. App. 130a–131a, 178a–192a. The courts explained that by forcing state and private grantees to violate established standards of medical care, the Rule will compel many grantees to exit the program. AMA Pet. App. 131a, 180a–182a. That loss of the nationwide Title X network will reduce access to healthcare and family-planning services, decrease testing for sexually transmitted infections and cancer, and increase unintended pregnancies and abortions—imposing significant costs on the States and the health of their most vulnerable residents. AMA Pet. App. 131a, 182a–184a.

Finally, the courts determined that respondents would not suffer any irreparable harm from maintaining the preexisting regulatory requirements for nondirective counseling and financial (but not physical) separation of Title X funds given that those regulations had governed the Title X program "for nearly 50 years and have an excellent track record." AMA Pet. App. 132a; *see also* AMA Pet. App. 193a (no evidence of harm to government).

3. Respondents appealed and moved for a stay of the preliminary injunctions pending appeal. In June 2019, a motions panel of the Ninth Circuit issued a published opinion granting respondents' motions to stay the preliminary injunctions, thereby allowing HHS to implement the Final Rule immediately. AMA Pet. App. 289a. The petitioner States in both the cases moved for rehearing. On July 3, 2019, the full Ninth Circuit Court of Appeals ordered that the cases be heard by an en banc panel of that court and declared the stay order non-precedential. 927 F.3d 1045. While

14

the en banc proceedings were pending, an en banc panel of the Ninth Circuit maintained the stay pending its rehearing, over the dissent of four judges. 928 F.3d 1153.

## C. The Ninth Circuit's En Banc Decision Below

In February 2020, an en banc panel of the Ninth Circuit reversed the grant of preliminary injunctions in each of the cases, and denied respondents' motions for a stay pending appeal as moot, stating that petitioners "will not prevail on the merits of their claims." AMA Pet. App. 23a n.10, 68a. The en banc panel ruled that the Final Rule is not contrary to either the Nondirective Mandate or the ACA's Noninterference Mandate, and is not arbitrary and capricious. AMA Pet. Pet App. 68a.[5]

1. The Ninth Circuit held that the Rule is consistent with the Nondirective Mandate. AMA Pet. App. 28a–40a. The court recognized that the Rule allows Title X providers to counsel pregnant patients solely about prenatal care while omitting any information about abortion, prohibits Title X providers from referring patients for an abortion even when the patient specifically requests such a referral, and requires providers to refer a pregnant patient for prenatal care even when the patient specifically states that she does not want such information. The court concluded that the Nondirective Mandate does not require Title X providers to present all options on an

---

[5] The en banc panel decided the merits of the legal claims over the objections of petitioners that (a) the issue before that court was only whether a preliminary injunction was warranted, and (b) the respondents had not yet produced the administrative record as required for review of arbitrary-and-capricious claims under the APA.

15

"equal basis"—even when a pregnant patient has asked for information about all of her options. AMA Pet. App. 34a. And the court further concluded that the Nondirective Mandate does not apply to referrals at all. AMA Pet. App. 34a.

The Ninth Circuit also held that the Rule is consistent with the ACA's Noninterference Mandate. AMA Pet. App. 41a–49a. The court concluded that the Noninterference Mandate does not apply to Title X because it is a grant program and Congress is free "not to subsidize certain activities." AMA Pet. App. 48a.

Finally, the Ninth Circuit held that the Final Rule is not arbitrary and capricious. AMA Pet. App. 49a–68a. The court concluded that HHS had adequately addressed concerns that the Rule required Title X providers to violate medical ethics, based on HHS's statements of its view that such concerns were unfounded. AMA Pet. App. 62a–65a. The court further concluded that HHS had adequately addressed the likely costs and public-health harms from the Rule by stating the agency's beliefs that (a) Title X providers could comply with the physical-separation requirements for about $30,000, and (b) new providers will be able to take the place of Title X grantees that drop out of the program because of the Rule. AMA Pet. App. 55a–61a.

2. Four of the eleven judges on the en banc panel dissented. AMA Pet. App. 69a (Paez, J., dissenting). The dissent would have held that the Final Rule violates the Nondirective Mandate by steering pregnant patients away from abortion and "toward childbirth at every turn." AMA Pet. App. 73a. The dissent explained that referrals for care had always been understood to be an important part of the

16

information provided during pregnancy counseling, and the Rule's restrictions on referrals slanted this information towards prenatal care and away from abortion—regardless of patients' stated preferences. AMA Pet. App. 72a–79a. The dissent also reasoned that the Rule was subject to and in violation of the ACA's prohibition against any HHS regulation that imposes unreasonable barriers to patients' obtaining appropriate medical care, impedes timely access to care, or interferes with patient-provider communications regarding a full range of treatment options. AMA Pet. App. 79a–82a. And the dissent concluded that the Rule is arbitrary and capricious because, inter alia, HHS failed to account for the extensive evidence demonstrating that the Rule's restrictions on pregnancy counseling and cost-prohibitive physical-separation requirements will cause many established Title X providers to leave the program, "leading to decreased access to Title X-funded care" and substantial harms to petitioner States, their residents, and public health in their jurisdictions. AMA Pet. App. 88a–93a.

3. Petitioners sought rehearing en banc from the full Ninth Circuit or, alternatively, rehearing from the en banc panel. The court denied that request on May 8, 2020. AMA Pet. App. 291a–293a.

## REASONS TO GRANT THE PETITION

### A. There Is a Square Circuit Split on the Questions Presented Here.

The en banc decision of the Ninth Circuit in this case directly conflicts with the Fourth Circuit's more recent en banc decision in *Mayor of Baltimore v. Azar*, __ F.3d __, 2020 WL 5240442.

17

The decisions of the Ninth and Fourth Circuits each addressed a challenge to the Final Rule on the grounds that it violated the Nondirective Mandate and § 1554's Noninterference Mandate and that it was arbitrary and capricious. And the two courts reached opposite conclusions on each of the questions raised in this petition.

1. While the Ninth Circuit held that the Final Rule's counseling and referral restrictions did not violate the Nondirective Mandate, AMA Pet. App. 28a–40a, the Fourth Circuit held that it did, *Mayor of Baltimore*, 2020 WL 5240442, at *16–20. That court held that the Rule requires directive counseling— counseling that steers a patient towards one option over another—because "[b]y its very terms, it requires a doctor to refer a pregnant patient for prenatal care, even if she does not want to continue the pregnancy, while gagging her doctor from referring her for abortion, even if she has requested specifically such a referral." *Id.* at *16. Moreover, while the Ninth Circuit concluded that the Nondirective Mandate does not apply to referrals, AMA Pet. App. 34a, the Fourth Circuit held that the mandate forbids directive referrals just as much as other directive counseling, *Mayor of Baltimore*, 2020 WL 5240442, at *16–18.

2. Similarly, while the Ninth Circuit held that the Final Rule's referral restrictions did not violate the Noninterference Mandate of the ACA, AMA Pet. App. 41a–49a, the Fourth Circuit held that it did, by interfering with communications between patients and providers, *Mayor of Baltimore*, 2020 WL 5240442, at *20–23. The Fourth Circuit noted that the Rule prohibits providers from referring a patient for an abortion when she requests such a referral, and it also requires providers to "hide the ball" by refusing to

18

identify, from among a list of medical providers, the ones who perform abortions. *Id.* at *20. The court explained that "considering the time-sensitive nature of pregnancy and access to legal abortion, this attempt to hoodwink patients creates 'unreasonable barriers' to 'appropriate medical care,' and 'impedes timely access' to health care services." *Id.* (quoting § 1554).

3. Finally, the two courts of appeals split on the question of whether the Final Rule was arbitrary and capricious. While the Ninth Circuit concluded that HHS had adequately considered and rejected the claims that the Rule was inconsistent with medical ethics, AMA Pet. App. 62a–65a, and would require massive expenditures to comply with the physical separation requirement, AMA Pet. App. 55a–59a, the Fourth Circuit held exactly the opposite—that HHS had not adequately explained why it concluded that (1) the Rule was consistent with medical ethics and (2) Title X providers would only need to spend $30,000 on average to comply with the physical-separation requirement, *Mayor of Baltimore*, 2020 WL 5240442, at *10–15.

As to medical ethics, the Fourth Circuit noted that every major medical organization in the country— including the American Medical Association, the American College of Obstetricians and Gynecologists, the American Academy of Family Physicians, and the American Academy of Nursing—had informed HHS that the rule's counseling and referral restrictions could force medical providers to violate their ethical obligations to their patients. *Id.* at *10. "[N]o professional organization of any kind" took the position that the restrictions were consistent with medical ethics. *Id.* (quotation marks omitted). In responding to those comments HHS stated merely that it "disagrees" with

19

that conclusion and "believes" that the Rule is "not inconsistent" with medical ethics. *Id.* at \*11 (quoting 84 Fed. Reg. at 7,724). HHS did not explain the basis for this disagreement. While the Ninth Circuit found HHS's explanation to be adequate, AMA Pet. App. 63a–65a, the Fourth Circuit held that HHS's failure "to address head-on the arguments of all these medical organizations" violated the agency's responsibility to explain why it had made a decision when "every indication in the record points the other way," *Mayor of Baltimore*, 2020 WL 5240442, at \*10–11 (quoting *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 56–57 (1983)).

As to the cost of physical separation, the Fourth Circuit noted the overwhelming evidence in the administrative record that Title X providers would need to spend vastly more money than HHS projected to set up facilities that were completely physically separated from facilities that provided non–Title X care: at least several hundred thousand dollars, and perhaps even millions of dollars. *Id.* at \*14. The court observed that here too, HHS failed to explain how the agency arrived at its position. For all the court could tell, "this number was pulled from thin air," making HHS's analysis of costs arbitrary and capricious. *Id.* at \*15.

4. Moreover, each of the two courts of appeals was sharply divided. In the Ninth Circuit, seven of the en banc panel's eleven judges joined the majority's conclusions, and four judges dissented. AMA Pet. App. 69a-94a (Paez, J., dissenting). In the Fourth Circuit, nine of the court's fifteen judges joined the majority's conclusions on the Nondirective Mandate and the ACA's Noninterference Mandate, eight judges joined the majority in also finding the rule arbitrary and

20

capricious, and six judges dissented. *See Mayor of Baltimore*, 2020 WL 5240442, at \*27 (Diaz, J., concurring in the judgments); *id.* at \*28 (Richardson, J., dissenting).

The two courts thus reached diametrically opposite conclusions on each of the three questions presented here.

## B.  The Ninth Circuit's Decision Is Wrong.

The court of appeals' decision is wrong on each of the questions presented here.

1. The majority erred in concluding that the Final Rule's counseling and referral requirements could be reconciled with the Nondirective Mandate. AMA Pet. App. 28a–40a. The mandate, which has appeared in every appropriations bill since 1996, requires that "all pregnancy counseling" in Title X projects "shall be nondirective." Pub. L. No. 116-94, 133 Stat. 2534, 2558 (2019). The Rule violates that requirement by (1) prohibiting providers from giving their patients neutral information about where they can obtain an abortion even when the patient has specifically asked for that information, and (2) requiring providers to give patients information about prenatal care even when the patient does not want that information. *See* 42 C.F.R. § 59.14; 84 Fed. Reg. at 7,744. The Rule even forbids a doctor from answering a patient's question about whether a particular non–Title X provider performs abortions. 42 C.F.R. § 59.14(c)(2).

Those asymmetric burdens on information about abortion amount to a requirement that Title X providers direct patients, rather than giving them neutral, nondirective, counseling. The rule mandates the presentation of information slanted in favor of

21

childbirth, rather than the presentation of neutral information about all options as to which the patient has inquired. "The result is that patients are steered toward childbirth at every turn." AMA Pet. App. 73a (Paez, J., dissenting).

The majority concluded otherwise because it understood "counseling" in the Nondirective Mandate to exclude "referrals." AMA Pet. App. 34a. But as the Fourth Circuit explained, that understanding cannot be squared with how HHS itself used the terms in the Final Rule. *Mayor of Baltimore*, 2020 WL 5240442, at *16; *see also, e.g.*, 84 Fed. Reg. at 7,747 (discussing "referrals made . . . *during* such [nondirective] counseling" (emphasis added)). Nor can it be squared with how Congress used the terms in a related statutory context. *Mayor of Baltimore*, 2020 WL 5240442, at *17; *see also* 42 U.S.C. § 254c-6(a)(1) (requiring certain "referrals . . . on an equal basis with all other courses of action included in nondirective counseling to pregnant women"). And it is inconsistent with how the medical community understands and trains its own providers on counseling obligations—that is, to include referring patients as needed. *Mayor of Baltimore*, 2020 WL 5240442, at *18.

The majority also concluded that pregnancy counseling need not present "all options on an equal basis" to be "nondirective," as long as the information provided about selected options is "neutral." AMA Pet. App. 28a, 35a. But excluding information about an option the patient wants, while compelling the presentation of information about an option she does not want, is not neutral. "If a man were diagnosed with prostate cancer, and his doctor concluded that chemotherapy, radiation, or hospice were equally viable responses, each with different consequences for

22

his quality of life, he would be upset, to say the least, to discover that he had been referred only for hospice care." AMA Pet. App. 75a (Paez, J., dissenting). As the dissent recognized, "[s]uch a sham 'presentation' of options would in no sense be nondirective." *Id.*

2. The majority also erred in concluding that the Final Rule could be reconciled with the ACA's Noninterference Mandate, which prohibits HHS from promulgating any regulations that impose "unreasonable barriers" to patients' ability to obtain appropriate medical care, impede "timely access to health care services," interfere with patient-provider communications "regarding a full range of treatment options," or violate "the ethical standards of health care professionals." 42 U.S.C. § 18114. Among other ways that the Rule violates those requirements, its restrictions on providing neutral information about where a patient can obtain an abortion (i) interfere with provider-patient communications, (ii) violate medical ethics, and (iii) impede patients' timely access to healthcare services. AMA Pet. App. 80a–81a (Paez, J., dissenting).

The majority did "not even attempt to argue that the Rule complies with" the requirement set out in ACA § 1554's Noninterference Mandate. AMA Pet. App. 81a (Paez, J., dissenting). It instead concluded that § 1554 does not apply to Title X because Title X is a grant program and Congress is free "not to subsidize certain activities." AMA Pet. App. 48a. But nothing in the text of § 1554 supports limiting § 1554's scope in that manner. While *Congress* may have the constitutional authority to subsidize provider-patient communications that violate ethical standards, nothing in § 1554 suggests that Congress intended to give *HHS* authority to decide whether to do so.

23

3. Finally, the majority erred in concluding that the Final Rule satisfied the APA's foundational requirement of "reasoned decision-making" that rests on a logical "consideration of relevant factors." *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (quotation marks omitted).

First, HHS's conclusion that the rule is consistent with medical ethics is arbitrary and capricious because it "runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Every major medical organization commenting on the proposed rule raised concerns that the Final Rule would violate medical ethics, such as by requiring providers to withhold information from patients, force patients to receive information that they have stated they do not want, and make referral decisions inconsistent with a patient's medical needs. *See Mayor of Baltimore*, 2020 WL 5240442, at *10. Those organizations included the American Medical Association, which "literally wrote the book on medical ethics." AMA Pet. App. 87a n.13 (Paez, J., dissenting).

Contrary to the majority's conclusion, HHS did not adequately address those concerns merely by stating that it disagreed with them. AMA Pet. App. 62a–65a. Nothing in the administrative record supported the conclusion that the commenters' consensus view regarding medical ethics is wrong, and the agency's mere say-so is not reasoned decision-making. The en banc Fourth Circuit correctly noted that the Ninth Circuit majority's decision in this case was "unpersuasive," as its "discussion of medical ethics nowhere mentions the precise issue raised here: HHS's failure to justify or explain its conclusion that the Final Rule is consistent with medical ethics in the face of

24

overwhelming contrary evidence." *Mayor of Baltimore*, 2020 WL 5240442, at *13.

Second, HHS's conclusion that the physical-separation requirement would cost Title X providers only $30,000 on average was entirely unsupported by, and indeed counter to, the evidence before it. The administrative record showed that many providers' expenditures will be orders of magnitude higher. *See id.* at *14 (citing evidence from the administrative record that one provider's average capital costs would be nearly $625,000, and another's would be "hundreds of thousands, or even millions, of dollars"). As the dissent pointed out, even the cost of hiring *one* front-desk staff member for the new, physically separate facility would likely exceed $30,000. AMA Pet. App. 89a–90a n.16 (Paez, J., dissenting). The majority deferred to HHS's plucked-from-thin-air figure, AMA Pet. App. 61a, but did not point to any evidence in the administrative record supporting that figure.

Third, HHS failed to address adequately the extensive evidence that the Rule's restrictions on pregnancy counseling, and costly physical-separation requirements, will force many established Title X providers to leave the program. As the dissent correctly recognized, HHS's conclusion that new providers would materialize was "baseless" and HHS thus failed to address meaningfully the resulting negative impacts on patients' access to family planning services and public health that the loss in providers would cause. AMA Pet. App. 93a (Paez, J., dissenting).

4. The majority relied heavily on this Court's decision in *Rust v. Sullivan*, 500 U.S. 173, but that case did not address any of the issues raised here. *Rust*

25

upheld earlier regulations limiting abortion-related counseling and requiring physical separation. *Id.* at 184, 188. But *Rust* was decided before enactment of either the Nondirective Mandate or the Noninterference Mandate, so it did not address either of the statutory arguments presented here. And *Rust* involved a different administrative record than presented here, so it did not address the argument that HHS arbitrarily and capriciously ignored the comments it received on the 2019 Final Rule. *Rust* therefore does not answer the questions presented here.

## C. The Cases Decided by the Ninth Circuit Present the Best Vehicle for Deciding the Challenges to the Final Rule.

If the Court concludes that the circuit split merits resolution, it should grant review of the Ninth Circuit decision instead of or in addition to the Fourth Circuit decision. The petitioners seeking a writ of certiorari from the Ninth Circuit's decision consist of a broad spectrum of Title X stakeholders from across the country who can best assist the Court in understanding the Rule's impacts on providers, patients, and public health. Many of the petitioners here presciently warned HHS that if the proposed rule were adopted, substantial numbers of Title X providers would be forced to leave the program—with severe consequences for the quality and availability of critical family planning and reproductive health services for low-income patients. In addition, unlike the Fourth Circuit, the Ninth Circuit addressed petitioners' claim that HHS acted arbitrarily and capriciously in failing to address these harms from the Rule and instead relying on unsupported speculation about new grantees filling the severe gaps in Title X services caused by the

26

Rule. Accordingly, petitioners' cases present the best vehicle for understanding the full scope of the Rule's harms and deciding whether the Rule is arbitrary and capricious in violation of the APA.

1. *Mayor of Baltimore v. Azar* was brought by the Mayor and City Council of Baltimore, and the Fourth Circuit's decision addresses the harms to those plaintiffs alone. In contrast, the cases decided together by the Ninth Circuit were brought by numerous Title X stakeholders, including the twenty-one States and the District of Columbia that are petitioners here. Those governmental plaintiffs include a number of States that were direct Title X grantees when the Final Rule was promulgated. And prior to the Rule, over 2.4 million patients in those States were receiving Title X services every year.[6] Moreover, the other plaintiffs in the Ninth Circuit cases, who have filed a separate petition for certiorari, are private medical providers and organizations representing family planning providers operating throughout the nation: including Planned Parenthood Federation of America—whose affiliates served 40% of the Title X patients in the nation—and National Family Planning & Reproductive Health Association, an organization whose members operated or funded over 3,500 clinics serving more than 3.7 million Title X patients annually. *See* AMA Pet. App. 129a, 143a.

The parties to the Ninth Circuit cases are best positioned to explain the full impact of the Rule's consequences to public health and patient wellbeing.

---

[6] This calculation is based on information provided in the comment letter submitted by the Guttmacher Institute. *See* Comment Letter from Guttmacher Institute 21-22 (tbl. 1) (July 31, 2018) (internet).

27

Indeed, petitioners here recognized the extensive harms that the proposed rule would impose on patients and the public health, and they submitted comments to HHS warning of the adverse consequences that would result if the Rule were adopted. For example, many of the petitioner States and Planned Parenthood Federation of America explained that because the rule is at odds with professional and ethical health care obligations, they would be forced to stop providing Title X services if the Rule were adopted. *See* AMA Pet. App. 129a, 254a–255a. Petitioners also accurately warned of the harm to patients and the public health that would be caused by the forced departure from the Title X program of established grantees and experienced providers.

Petitioners explained that forcing out many of the petitioner States, Planned Parenthood affiliates, and other providers "would cause gaps in access to care,"[7] "shrink and diminish the effectiveness of the Title X network,"[8] and "leave thousands of residents without reasonable options for critical family planning services."[9] Petitioners observed that loss of so many well-established and trusted Title X providers would be particularly harmful for rural and medically underserved areas, where Title X funded clinics often

---

[7] Comment Letter from Planned Parenthood Federation of America & Planned Parenthood Action Fund 15 (July 31, 2018) (internet).

[8] Comment Letter from National Family Planning & Reproductive Health Association 4 (July 31, 2018) (internet).

[9] Comment Letter from Attorneys General of Washington, Massachusetts, Oregon, and Vermont 1 (July 31, 2018) (internet) ("Comment Letter from Washington, et al.").

28

"are the only source for low-cost family planning services."[10] And petitioners provided evidence to HHS that any remaining providers would not have the capacity to serve the high volume of family planning patients that Planned Parenthood and other Title X clinics had been serving.[11]

As petitioners explained, given the proven benefits of the Title X program in providing preventive care and screenings and reducing unintended pregnancies, the result would be more unintended pregnancies, riskier pregnancies, more abortions, more sexually transmitted infections, and worse health outcomes overall.[12] Petitioners' extensive knowledge of the Title X program and the public-health effects of the Rule forcing so many providers to exit the program will greatly assist the Court's review.

2. The breadth of petitioners' experience, and its geographic reach, will not only help the Court understand the full impact of the Rule, but will also more fully illuminate why the rule is arbitrary and capricious within the meaning of the APA and *State Farm*. HHS adopted the Rule without adequately addressing the devastating impacts on the Title X

---

[10] Comment Letter from State of Hawaiʻi (pt. 2) 1 (July 31, 2018) (internet).

[11] Comment Letter from Attorneys General of California, Connecticut, Delaware, Hawaiʻi, Illinois, Iowa, Maine, Maryland, Minnesota, New Jersey, New Mexico, North Carolina, and the District of Columbia 14 (July 30, 2018) (internet) ("Comment Letter from California, et al."); Comment Letter from Washington, et al., *supra,* at 24-25.

[12] Comment Letter from California, et al., *supra,* at 2, 14–16; Comment Letter from State of New York (attach. 2) 7–9 (July 30, 2018) (internet); Comment Letter from Washington, et al., *supra,* at 26.

29

program and public health that petitioners had identified in their comments. "On the one hand, the agency proclaimed that a myriad of benefits would flow from the Final Rule without providing any substantiating basis or analysis. On the other, HHS either ignored or dismissed out of hand evidence of the significant costs the Final Rule is likely to inflict that numerous commenters brought to its attention." AMA Pet. App. 254a.

The Ninth Circuit expressly rejected petitioners' claim that the Rule was arbitrary and capricious because of HHS's failure to address adequately the anticipated harms, deferring to HHS's unfounded predictions about "the behavior of grantees and prospective grantees." AMA Pet. App. 58a. Because *Mayor of Baltimore* does not address this additional basis for finding the Rule arbitrary and capricious, the Ninth Circuit decision provides the best vehicle for adjudicating the full scope of the legal challenges to the Final Rule.

Petitioners' experience since the Rule became effective further exposes how the Ninth Circuit erred in deferring to HHS's unsupported speculation about the effects of the Rule on grantees and providers. As petitioners warned, an unprecedented number of providers have withdrawn from the Title X program. Approximately 1,000 of the 4,000 previously existing Title X sites are no longer participating in the program, including clinics run by city or state health departments, federally qualified health centers, and

30

nonprofit organizations.[13] In the petitioner States of Hawai'i, Oregon, and Vermont, 100 percent of the Title X providers withdrew from the program.[14] In the petitioner States of New York, Connecticut, Illinois, and Maryland, at least 90 percent of the providers withdrew from the Title X program.[15] And in the petitioner States of California, Massachusetts, Michigan, Minnesota, and New Jersey, the Title X provider networks were reduced by 50 to 89 percent.[16]

The resulting gaps in the availability of Title X services remain, contrary to HHS's "sunny, and baseless" speculation that new Title X providers would materialize to replace those forced out by the Rule. *See* AMA Pet. App. 93a (Paez, J., dissenting). For example, no new Title X providers have emerged to replace the Title X programs in petitioners Hawai'i, Oregon, and Vermont, leaving these States without any Title X providers.[17] New York, which previously had 180 Title X funded sites, now has only two small grantees.[18] Other hard-hit States have likewise been left with

---

[13] *See* Kaiser Family Found., *The Status of Participation in the Title X Federal Family Planning Program* (Dec. 20, 2019) (internet).

[14] Ruth Dawson, *Trump Administration's Domestic Gag Rule Has Slashed the Title X Network's Capacity by Half* (Guttmacher Inst. Feb. 26, 2020) (internet).

[15] *See id.*

[16] *See id.*

[17] *See* Office of Population Affairs, U.S. Dep't of Health & Human Servs., Title X Family Planning Directory (Aug. 2020) ("Title X Directory (Aug. 2020)") (internet) (listing no grantees in these States).

[18] *Id.* at 5; Kaiser Family Found., *Status of Participation*, *supra.*

31

only a few small grantees with limited geographic coverage.[19] In Maryland, where there were previously 81 Title X clinics, only 7 remain.[20] In Illinois, 104 Title X clinics have been reduced to 14.[21] And California, which had the largest Title X network in the country, lost 128 of its 366 Title X health centers, leaving 18 previously served counties with no Title X providers.[22]

As of August 2020, only six new grantees had joined the Title X program,[23] and many of the newly funded clinics do not provide contraception or contraception counseling.[24] And there has already been a reduction in Title X services nationwide. In 2019, the year during which the Final Rule was implemented, the Title X program served 21 percent

---

[19] Moreover, most of the remaining Title X participants in these States are community health centers, which are designed to provide primary care to underserved areas and serve many fewer family planning patients than dedicated family planning clinics. *See* Title X Directory (Aug. 2020), *supra*; Kinsey Hasstedt, *Federally Qualified Health Centers: Vital Sources of Care, No Substitute for the Family Planning Safety Net*, 20 Guttmacher Pol'y Rev. 68 (2017) (internet).

[20] Kaiser Family Found., *Status of Participation*, *supra*; *see* Title X Directory (Aug. 2020), *supra*.

[21] Kaiser Family Found., *Status of Participation*, *supra; see* Title X Directory (Aug. 2020), *supra,* at 70.

[22] Essential Access Health, California's Statewide Title X Network Coverage Map 2018 vs. 2020 (Apr. 2020) (internet).

[23] *Compare* Title X Directory (Aug. 2020), *with* Office of Population Affairs, U.S. Dep't of Health & Human Servs., Title X Family Planning Directory (Dec. 2018) (internet),

[24] Ariana Eunjung Cha, *New Federally Funded Clinics Emphasize Abstinence, Natural Family Planning*, Wash. Post (July 29, 2019) (internet).

32

fewer patients (844,083) than in 2018.[25] Petitioners' broad-based experience with the Rule's nationwide effects will further assist the Court in evaluating the issues presented by the split between the en banc decisions of the Ninth and Fourth Circuits.

## CONCLUSION

The petition for a writ of certiorari should be granted.

Respectfully submitted,

ELLEN F. ROSENBLUM
  *Attorney General*
  *State of Oregon*
BENJAMIN N. GUTMAN
  *Solicitor General*
JONA J. MAUKONEN
  *Senior Assistant*
    *Attorney General*

XAVIER BECERRA
  *Attorney General*
  *State of California*

October 2020

LETITIA JAMES
  *Attorney General*
  *State of New York*
BARBARA D. UNDERWOOD*
  *Solicitor General*
ANISHA S. DASGUPTA
  *Deputy Solicitor General*
JUDITH N. VALE
  *Senior Assistant*
    *Solicitor General*
LAURA ETLINGER
  *Assistant Solicitor General*
barbara.underwood@ag.ny.gov

\* *Counsel of Record*

*(Counsel list continues on next page.)*

---

[25] Office of Population Affairs, U.S. Dep't of Health & Human Servs., *Title X Family Planning Annual Report: 2019 National Summary* 9 (Sept. 2020) (internet)

33

PHIL WEISER
  *Attorney General*
  *State of Colorado*
136 State Capitol Bldg.
Denver, CO 80203

WILLIAM TONG
  *Attorney General*
  *State of Connecticut*
P.O. Box 120
55 Elm St.
Hartford, CT 06106

KATHLEEN JENNINGS
  *Attorney General*
  *State of Delaware*
820 N. French St., 6th Fl.
Wilmington, DE 19801

CLARE E. CONNORS
  *Attorney General*
  *State of Hawai'i*
425 Queen St.
Honolulu, HI 96813

KWAME RAOUL
  *Attorney General*
  *State of Illinois*
100 W. Randolph St.
Chicago, IL 60601

BRIAN E. FROSH
  *Attorney General*
  *State of Maryland*
200 St. Paul Pl., 20th Fl.
Baltimore, MD 21202

MAURA HEALEY
  *Attorney General*
  *Commonwealth of*
    *Massachusetts*
One Ashburton Pl.
Boston, MA 02108

DANA NESSEL
  *Attorney General*
  *State of Michigan*
P.O. Box 30212
Lansing, MI 48909

KEITH ELLISON
  *Attorney General*
  *State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther
  King Jr. Blvd
Saint Paul, MN 55101

AARON FORD
  *Attorney General*
  *State of Nevada*
100 North Carson St.
Carson City, NV 89701

GURBIR S. GREWAL
  *Attorney General*
  *State of New Jersey*
25 Market St.
Trenton, NJ 08625

HECTOR BALDERAS
  *Attorney General*
  *State of New Mexico*
P.O. Drawer 1508
Santa Fe, NM 87504

JOSHUA H. STEIN
  *Attorney General*
  *State of North Carolina*
114 W. Edenton St.
Raleigh, NC 27603

JOSH SHAPIRO
  *Attorney General*
  *Commonwealth of*
  *Pennsylvania*
Strawberry Sq., 16th Fl.
Harrisburg, PA 17120

PETER F. NERONHA
  *Attorney General*
  *State of Rhode Island*
150 South Main St.
Providence, RI 02903

THOMAS J. DONOVAN, JR.
  *Attorney General*
  *State of Vermont*
109 State St.
Montpelier, VT 05609

MARK R. HERRING
  *Attorney General*
  *Commonwealth of Virginia*
202 North 9th St.
Richmond, VA 23219

JOSHUA KAUL
  *Attorney General*
  *State of Wisconsin*
P.O. Box 7857
Madison, WI 53707

KARL A. RACINE
  *Attorney General*
  *District of Columbia*
Suite 630 South
441 4th St., NW
Washington, DC 20001